IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VTT TECHNICAL RESEARCH CENTRE OF FINLAND LTD., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 25-229-JCB |
| HID GLOBAL CORPORATION and OMNI-ID USA, INC., | ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO STAY PROCEEDINGS PENDING *EX PARTE* REEXAMINATION AND TO <u>DEFER THE FEBRUARY 6, 2025 RULE 16 CONFERENCE</u>**

OF COUNSEL:
Lionel M. Lavenue
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER LLP
1875 Explorer Street, Suite 800
Reston, VA  20190-6023
(571) 203-2700

Dated: January 5, 2026

Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for HID Global Corporation and OMNI-ID USA, Inc.*

## **TABLE OF CONTENTS**

I.    INTRODUCTION: VTT'S ARGUMENTS FAIL UNDER THE THREE-
      FACTOR TEST; THE CASE FOR A STAY IS COMPELLING...................................... 5

II.   ARGUMENT: VTT FAILS TO REBUT THAT EACH FACTOR FAVORS A
      STAY..................................................................................................................... 7

      A.    Factor 1 Weighs in Favor of a Stay by Simplifying the Issues at Hand
            Because the Reexamination Outcome Will Likely Result in Either New
            Claims with New Constructions Or Claims Cancelled, Saving Court and
            Party Resources................................................................................................... 7

      B.    Factor 2 Overwhelmingly Weighs in Favor of a Stay Because This
            Litigation is in Its Infancy.......................................................................... 9

      C.    Factor 3 also Weighs in Favor of a Stay Because a Stay Will Not Unduly
            Prejudice VTT as it Chose to Delay Filing This Lawsuit Until Close to the
            '143 Patent's Expiration Date ................................................................11

III.  CONCLUSION: THIS COURT SHOULD GRANT DEFENDANTS'
      REQUESTED STAY AND DEFER THE RULE 16 CONFERENCE ............................ 14

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

*3G Licensing, S.A. v. HTC Corp.*,
    C.A. No. 17-83-GBW, 2023 WL 34533 (D. Del. Jan. 4, 2023)............................................ 13

*Allen-Bradley Co., LLC v. Kollmorgen Corp.*,
    199 F.R.D. 316 (E.D. Wis. 2001) ........................................................................................ 14

*Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
    637 F.3d 1324 (Fed. Cir. 2011) ............................................................................................ 9

*Belden Techs. Inc. v. Superior Essex Comms. LP*,
    No. 08-63, 2010 WL 3522327 (D. Del. Sept. 2, 2010) ........................................................ 14

*Destination Maternity Corp. v. Target Corp.*,
    12 F. Supp. 3d 762 (E.D. Pa. 2014) .................................................................................... 14

*Gould v. Control Laser Corp.*,
    705 F.2d 1340 (Fed. Cir. 1983) ........................................................................................... 10

*Kearns v. Chrysler Corp.*,
    32 F.3d 1541 (Fed. Cir. 1994) ........................................................................................11, 13

*Princeton Digit. Image Corp. v. Konami Digit. Entm't Inc.*,
    Nos. 12-1461 et al., 2014 WL 3819458 (D.Del. Jan. 15, 2014) ........................................ 5, 10

*Prolitec v. Scentair Technologies, LLC*,
    No. 20-984, 2023 WL 5037173 (D. Del. Aug. 8, 2023) ........................................................ 9

*Shockwave Medical, Inc. v. Cardiovascular Systems, Inc.*,
    142 F.4th 1371 (Fed. Cir. 2025) .......................................................................................... 12

*SoftView LLC v. Apple Inc.*,
    10-389-LPS, 2012 WL 3061027 (D. Del. Jul. 26, 2012) ...................................................... 14

**ABBREVIATIONS**

| Abbreviation | Description |
|---|---|
| VTT | VTT Technical Research Centre of Finland |
| HID | HID Global Corporation |
| Omni-ID | Omni-ID USA, Inc. |
| Defendants | HID Global Corporation and Omni-ID USA, Inc. |
| '143 patent | U.S. Patent No. 7,724,143 |
| Mot. | Brief in support of Defendants Motion to Stay Pending *Ex Parte* Reexamination (D.I. 34) |
| Opp. | Brief in opposition of Defendants Motion to Stay Pending *Ex Parte* Reexamination (D.I. 36) |
| USPTO | United States Patent and Trademark Office |
| SNQ | Significantly New Question of Patentability |

4

I.    **INTRODUCTION: VTT'S ARGUMENTS FAIL UNDER THE THREE-FACTOR TEST; THE CASE FOR A STAY IS COMPELLING**

Defendants now submit this Reply brief in support of the Motion to Stay. The District of Delaware generally considers three factors for evaluating a stay pending proceedings at the USPTO: (1) whether a stay will simplify the issues; (2) the progress of the litigation; and (3) whether the stay will unduly prejudice the nonmoving party. *Princeton Digit. Image Corp. v. Konami Digit. Entm't Inc.*, Nos. 12-1461 et al., 2014 WL 3819458, at *2 (D.Del. Jan. 15, 2014). All three factors favor a stay.

Instead of addressing each factor, VTT weaves two erroneous rebuttal arguments throughout its opposition, often repeating itself in each respective factor. VTT's arguments are based on two theories: (1) that Defendants intentionally delayed seeking reexamination, and (2) that the outcome of the reexamination is unlikely to affect this litigation. Both arguments are misplaced. The litigation remains in its infancy, and the technical basis for reexamination only became clear after VTT's own statements in opposition to the Motion to Dismiss.

First, VTT does not and cannot dispute that this *litigation* remains in its infancy. VTT instead points to an allegation that this patent dispute was fought privately between the parties behind the scenes since 2018 for more than seven years[1] and that Defendants allegedly dragged their feet to the Patent Office to invalidate '143 patent. *Dispute* and *litigation* are two different concepts. The District of Delaware courts do not consider the stage of *dispute* in evaluating whether to grant a stay, nor did VTT provide any case law supporting so. Indeed, the *seven-year* delay is a red herring and nevertheless is of VTT's own making. Indeed, VTT's own hand in delaying any litigation enforcement of its patent against Defendants raises concerns of improper

---

[1] According to the Complaint, VTT approached Defendants in June 2018 in an effort in "exploring potential licensing or sale opportunities," rather than alleging infringements. D.I. 1, ¶¶ 21-24.

gamesmanship *by VTT* for submarining its patents rights as a patent owner. After the seven-year delay, VTT is in no position to complain how the reexamination was not filed earlier—after all, the confusing claim term "the fold acts as a primary source of a magnetic field" makes it difficult for Defendants to frame a basis for the reexamination, until VTT made its argument in opposition to the Motion to Dismiss, stating its position that the structure "fold" is a "well-known source" of this functional limitation, i.e., having the structure "fold" in an antenna means that the fold functionally "acts as a primary source of magnetic field." D.I. 16, 14-18. Accordingly, the invalidity grounds raised in the reexamination only became evident *after* VTT's arguments raised here in opposition to the Motion to Dismiss. Any speculation that Defendants *could have* requested an earlier reexamination ignores the facts and the technical details of this case.

Second, VTT cannot realistically allege that the *ex parte* reexamination will have no impact on the underlying technical merits of this patent dispute. There is nearly an 80% chance that the reexamination will result in modified claim terms, or even cancelled terms, which directly impacts the technical application of these claims to all stages of the litigation from claim construction to invalidity and noninfringement contentions, and both fact and expert discovery.

Indeed, Defendants moved for the stay just days after the Court scheduled the Rule 16 conference. Briefing for this Motion to Stay will conclude more than a month before that set conference. No discovery has been made, no Rule 16 conference has occurred, and no trial date has been set. All the facts and case law precedent indicate that this case remains in its infancy. Notably, VTT failed to address, let alone distinguish, any case laws Defendants cited.

For these reasons, Defendants respectfully request that the Court grant the Motion, stay the proceedings pending the resolution of the *ex parte* reexamination, and defer the Federal Rule of Civil Procedure Rule 16 scheduling conference until after the resolution of the Motion to Stay.

## II.    ARGUMENT: VTT FAILS TO REBUT THAT EACH FACTOR FAVORS A STAY

### A.    Factor 1 Weighs in Favor of a Stay by Simplifying the Issues at Hand Because the Reexamination Outcome Will Likely Result in Either New Claims with New Constructions Or Claims Cancelled, Saving Court and Party Resources

A stay will promote judicial economy by allowing the Patent Office to resolve key questions of validity and claim scope before this Court expends resources on discovery and trial. The *ex parte* reexamination is likely to result in altered claim scopes or even all claims cancelled, effectively resetting every technical merit of this patent dispute—a reset effecting all stages of this litigation.

VTT erroneously argues that the *ex parte* reexamination will not simplify this case because "at every stage, it leaves the same issues for the Court to decide." Opp. 8-11. VTT specifically challenges this statistical outcome, cherry-picking isolated USPTO statistics and arguing that "simplification depends on a speculative and statistically unlikely outcome." Opp. at 9; *see also* Mot., Exhibit 4 at 65. Indeed, VTT claims—without a citation—that "only thirteen percent of third-party reexaminations" had complete claim cancellations and that therefore "[i]n the overwhelming majority, at least some claims survive." Opp. at 9. Defendants respectfully note that it is unclear where VTT obtains the 13% statistics as the USPTO statistics show that the "all claims canceled" rate for third-party reexaminations consistently higher than 13% since 2019. *See* Mot., Exhibit 4 at 64-75 (*Ex Parte* Reexamination Filing Data sheets, line 10.b.b). Regardless, VTT, by citing only the "all claims cancelled" rate, ignores the over 60% reexaminations that had claim scope changed—these cases needed a new claim construction, requiring the courts to roll back to at least *Markman* hearings.

Nevertheless, recent USPTO statistics show that in nearly 80% of third-party requested reexaminations in 2024, claims are either amended or cancelled, requiring new claim construction and potentially eliminating issues entirely. Mot., Exhibit 4 at 65. If this case proceeds without a

stay, there is an 80% chance that the claim construction becomes moot, and the parties will likely need to redo (or drop altogether) invalidity and noninfringement contentions, resulting in unnecessarily waste of judicial and party resources. Even for those minority outcomes where the claims remain untouched, the Court would still benefit from a more robust intrinsic record.

Next, VTT argues that the pending *ex parte* reexamination would not "meaningfully reduce the work of this litigation" because "[p]roceeding with discovery now conserves, rather than wastes, judicial and party resources." Opp. at 10. VTT cites no support for this allegation that proceeding now "conserves" resources when the chance of duplicating work is nearly 80%. *Id*. At best, there is a 20% chance that the expenditure of resources would be neutral, i.e., not "conserving" but rather that there would be no duplicated work. VTT's rebuttal, however, fails entirely to address the most likely outcome that the claims *will be* either amended or cancelled. As discussed above, and in light of the fact that there is over a 92% chance of the USPTO finding a SNQ determination, it is highly likely that the claims will be amended or canceled after the reexamination. Therefore, instead of, as VTT argues, discovery "center[ing] on the same accused products, the same technical documents, the same witnesses, and the same development history" (Opp. at 10), the significantly more likely outcome of the *ex parte* reexamination is that such discovery would be significantly altered, or not needed altogether. *See* Mot. at 12-13.

VTT further argues that certain dependent claims are not challenged in the reexamination, thus the reexamination would be incomplete and would "leave[] core issues untouched." Opp. at 9. VTT, however, fails to explain what the "untouched 'core issues'" are. VTT does not even allege infringement of these dependent claims in the first place. D.I. 1, Exhibit A2. VTT does not and cannot explain how these dependent claims, not being asserted infringement, not mentioned in pre-suit correspondences, and not briefed, are nevertheless "core issues." They are not.

8

VTT further argues that the *ex parte* reexamination "carries no estoppel" and "does not narrow defenses or bind defendants in subsequent litigation" and that "[d]efendants remain free to advance the same invalidity arguments in this Court that they present to the Patent Office, based on the same prior art." Opp. at 10. VTT's focus is misplaced. Lacking estoppel does not reduce the objective likelihood of simplification. In fact, high cancellation and amendment rates mean issues are often resolved outright by the USPTO. Even if *some* problems remain to be solved by this Court after the reexamination, the proceedings at the USPTO will not only add critical material facts and arguments to the intrinsic record, but it will also clarify the claim scope and provide this Court with the USPTO's guidance on invalidity and subsequently on infringement analysis. Mot. at 12; *see also Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) (held that the statements made in reexamination have the same prosecution history estoppel effect, and that the patent owner "cannot attempt to distance itself from the disavowal of broader claim scope."). While it is true that Defendants could raise the same invalidity arguments in this Court, VTT seemingly agrees that having this present case running in parallel with the *ex parte* reexamination at the Patent Office duplicates the effort and thus is a waste of judicial resources. Opp. at 10. The proposed stay would prevent such a waste of judicial resources and simplify the case before this Court, consistent with the congressional intent to encourage stays for post-grant proceedings under the America Invents Act. *Prolitec v. Scentair Technologies, LLC*, No. 20-984, 2023 WL 5037173 (D. Del. Aug. 8, 2023) (listing cases).

## B. Factor 2 Overwhelmingly Weighs in Favor of a Stay Because This Litigation is in Its Infancy

VTT cannot dispute that the second factor, i.e., the progress of this litigation, overwhelmingly weighs in favor of a stay. Opp. at 11. Indeed, Defendants moved for the stay promptly, just 2 days after the Court scheduled the Rule 16 conference—and briefing for this

Motion to Stay will conclude more than a month before that set conference. All the facts and case law precedent indicate that this case remains in its infancy.

Instead of squarely addressing this factor, VTT pivots, alleging that fault rests on Defendants for supposed delays, arguing that the *dispute* is not "meaningfully early." Opp. at 11. This is wrong on three levels: (1) the courts evaluate stage of *litigation*, not the *dispute*; (2) even considering the stage of dispute, any delay was of VTT's own making; and (3) regardless of any delay, this case nevertheless remains in its infancy with trial at some yet-to-be-scheduled date.

First, *dispute* and *litigation* are two different concepts. The District of Delaware courts do not consider the stage of *dispute* in evaluating whether to grant a stay, nor did VTT provide any case law supporting so. *See Princeton Digit. Image*, 2014 WL 3819458, at *2.

Second, as discussed in Section II.C below, VTT sat on its patent rights and alleged grievances. VTT obtained the patent in 2010 and allegedly approached Defendants in 2018, yet delayed filing this lawsuit before finally suing Defendants for infringement in February 2025—almost fifteen years later. Opp. at 3-4. VTT cannot, on one hand, delay its filing until less than two years before the '143 patent's expiration date, and on the other hand rush the process disregarding pending reexamination challenges. *Gould v. Control Laser Corp.*, 705 F.2d 1340, 1342 (Fed. Cir. 1983) ("When a district court stays patent validity proceedings before it until completion of a reexamination proceeding, that stay must be accepted if the purpose of the reexamination statute is to be preserved.").

Third, while VTT's *dispute* might have allegedly started earlier in 2018, this *litigation* did not, i.e. VTT waited nearly 7 years before filing this suit. *See* Opp. 3-4. And based on that 2025 filing date, this case remains in its infancy. No discovery has been conducted, the Rule 16 conference has not yet occurred, and a trial date has not yet been set.

VTT next improperly bleeds several of the considerations from Factor 1 into this factor, erroneously arguing that (A) staying this case "would add delay, not efficiency," and (B) that the Court has already addressed "Defendant's initial merits arguments." Opp. 11. Setting aside that these arguments rehash Factor 1 analysis for simplicity, addressed above in Section II.A, they remain false. As discussed above, first, the future "work" VTT identifies, including discovery with respect to "Defendants' accused products, their technical documents, and their conduct," is without focus unless the claim scope is determined and remains subject to extensive overhaul. *Id.* Second, the Court did not address the merits of these stay factors in its Motion to Dismiss ruling. Rather instead the Court merely ruled that "defendants were on notice of the alleged infringement," and recognized the dispute on "primary source of magnetic field" is a claim-construction argument without opining on the merit. D.I. 31, 6-7. This litigation is indisputably in its infancy, and this factor therefore favors a say.

**C.    Factor 3 also Weighs in Favor of a Stay Because a Stay Will Not Unduly Prejudice VTT as it Chose to Delay Filing This Lawsuit Until Close to the '143 Patent's Expiration Date**

Any delay in this litigation is attributable to VTT's own prolonged inaction, not to Defendants. VTT waited nearly *fifteen years* after the patent issued to file suit, and any pre-suit damages are limited by statute. Opp. at 3-4. The patent expires in January 2027, and any prejudice from a stay is monetary and can be remedied by damages. *See Kearns v. Chrysler Corp.*, 32 F.3d 1541, 1550 (Fed. Cir. 1994).

As the request for *ex parte* reexamination shows, many of the invalidity grounds raised in the reexamination only became evident *after* VTT's arguments were raised in its opposition to the Motion to Dismiss. The *ex parte* reexamination has two separate grounds incorporating VTT's Motion to Dismiss arguments pertaining to the functional limitation "act[ing] as a primary source of magnetic field, of which the "fold" is a "well-known source." *See* as-filed Request for *Ex Parte*

Reexamination, Ex. 5, at 22, 24. These *ex parte* reexamination grounds show that, according to the Patent Owner's (VTT's) own statement in this litigation, because both underlying references disclose a "fold," they must also disclose the functional limitation of the fold "act[ing] as a primary source of magnetic field." *Id.*, *see also Shockwave Medical, Inc. v. Cardiovascular Systems, Inc.*, 142 F.4th 1371, 1380 (Fed. Cir. 2025) (held that patent owner statement can be used as evidence of general background knowledge to supply missing claim limitations). Patent Owner's (VTT's) position was not apparent until the Motion to Dismiss was fully briefed. Therefore, VTT's accusation that Defendants "chose not to [timely] seek Patent Office review" is a plainly incorrect. *See* Opp. at 6. Any speculation that Defendants *could have* requested an earlier reexamination ignores the facts and the technical details of this case.

VTT further argues that staying the present case would result in delays that "undermin[e] VTT's ability to meaningfully realize the value of its patent rights during the patent's limited remaining term." Opp. at 7-8. This is false. Any pre-suit damages are limited to the six years preceding this case filing, a stay does not alter that timeline. Additionally, any post-suit damages are limited by the term of the patent itself, and a stay likewise does not alter that timeline (unless, of course, the USPTO finds the patent invalid).

Indeed, any prejudice to VTT from a delay with this stay is of its own making. VTT argues that the harm of the stay would be magnified because the '143 patent expires on January 1, 2027. Opp. at 8. But VTT's "time-sensitive" argument is misplaced. The '143 patent was issued in 2010. Opp. at 3. VTT had years before filing this lawsuit to "meaningfully realize" any value of the '143 patent. In fact, VTT admits that it sought to monetize the '143 patent since at least 2018 (several years *beyond* the statutory pre-suit six-years) and apparently failed to do so. D.I. 35, ¶ 10. Now, VTT attempts to circumvent the notions that a patentee cannot sit on its rights and submarine the

industry for more than *six years*, only to attempt to extract some final breath value from the '143 patent just before it expires[2]—which explains why VTT is eager to fast track the present case.

Given that the '143 patent will expire on January 1, 2027, any jury verdict in this case could not result in injunctive relief, but only in an award of money damages. *Kearns*, 32 F.3d at 1550 ("when the rights secured by a patent are no longer protectable by virtue of expiration or unenforceability, entitlement to injunctive relief becomes moot"). As a result, even if VTT suffers any prejudice from a stay, it is monetary in nature and can be fully remedied by a damages award if VTT ultimately prevails. This further supports that a stay is appropriate, as it ensures judicial efficiency without risking irreparable harm to the patent owner.

Lastly, not only did VTT fail to address, let alone distinguish, Defendants' case laws, VTT's cited cases are inapposite. In each the court denied a stay only after substantial resources had been expended or trial was imminent. Here, the parties have only briefed a motion to dismiss, discovery has not begun, a trial date is not scheduled, even the Rule 16 meeting has not happened.

For example, in *3G Licensing* the plaintiff filed its lawsuit in 2017, and the defendant filed a request for *ex parte* reexamination in 2022 after waiting more than five years while the case was pending at the district court. *3G Licensing, S.A. v. HTC Corp.*, C.A. No. 17-83-GBW, 2023 WL 34533, at *5 (D. Del. Jan. 4, 2023). At the time *ex parte* reexamination request was filed, "[f]act and expert discovery have closed, and the Court has resolved all dispositive and *Daubert* motions." *Id*. Thus, the Court held that both parties and the court have invested "significant resources," which strongly weighed against a stay. *Id*. Similarly, in *Belden Techs.*, the stay was only raised "mere

---

[2] In addition to the instant case, VTT filed another case in this Court asserting a patent that expires in 2027. *See VTT Technical Research Centre of Finland Ltd. v. Diazyme Lab'ys, Inc.*, 1:25-cv-00661 (D. Del. May 29, 2025) (asserting U.S. Patent No. 7,749,712, which expires on February 19, 2027).

eleven days before trial." *Belden Techs. Inc. v. Superior Essex Comms. LP*, No. 08-63, 2010 WL 3522327, at *2 (D. Del. Sept. 2, 2010). Finally, in *SoftView*, while the court had not set a trial date and the discovery was not completed, the court recognized that "substantial resources already incurred by both the parties and the court in this litigation" because "substantial time and resources have been devoted in this case to scheduling and the resolution of discovery disputes, as well as Defendants' motions to sever, stay, and dismiss." *SoftView LLC v. Apple Inc.*, 10-389-LPS, 2012 WL 3061027, at *4 (D. Del. Jul. 26, 2012).

In the present case, however, although VTT filed this litigation in February 2025 (D.I. 1), to date, the parties have only spent limited resources on the briefing of one Motion to Dismiss. *See Destination Maternity Corp. v. Target Corp.*, 12 F. Supp. 3d 762, 770 (E.D. Pa. 2014) (dispositive motions as part of the early, less resource-intensive phase compared to the "considerable" resources required for full discovery and trial.); *see also Allen-Bradley Co., LLC v. Kollmorgen Corp.*, 199 F.R.D. 316, 318 (E.D. Wis. 2001) (*Markman* proceedings represent a major resource threshold in patent litigation). Defendants developed *ex parte* reexamination grounds after the Motion to Dismiss briefing and filed the *ex parte* reexamination only a couple of months later. *See* Mot., Exhibit 1, D.I. 34-1, (Electronic Acknowledgement Receipt). Fact and expert discovery have not started, no trial date has been scheduled, and the Rule 16 conference has not yet occurred. Indeed, this Motion to Stay briefing will conclude more than a month before the scheduled Rule 16 conference. VTT's cited caselaw is inapposite, and a stay is therefore heavily favored.

## III. CONCLUSION: THIS COURT SHOULD GRANT DEFENDANTS' REQUESTED STAY AND DEFER THE RULE 16 CONFERENCE

For these reasons, Defendants respectfully request that the Court grant this Motion, stay the proceedings pending the resolution of the *ex parte* reexamination, and defer the Federal Rule of Civil Procedure Rule 16 scheduling conference until after the resolution of the Motion to Stay.

OF COUNSEL:

Lionel M. Lavenue
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER LLP
1875 Explorer Street, Suite 800
Reston, VA  20190-6023
(571) 203-2700

Dated: January 5, 2026

/s/ Andrew E. Russell
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for HID Global Corporation and
OMNI-ID USA, Inc.*

# EXHIBIT 5



P.O. Box 1450
Alexandria, VA 22313 - 1450
www.uspto.gov

# ELECTRONIC ACKNOWLEDGEMENT RECEIPT

| APPLICATION # | RECEIPT DATE / TIME | ATTORNEY DOCKET # |
|---|---|---|
| **90/015,758** | **12/08/2025 04:58:45 PM Z ET** | **13947.0008-00000** |

## Title of Invention

ANTENNA CONSTRUCTION, FOR EXAMPLE FOR AN RFID TRANSPONDER SYSTEM

## Application Information

| | | | |
|---|---|---|---|
| APPLICATION TYPE | Utility / ex parte reexam | PATENT # | 7724143 |
| CONFIRMATION # | 4081 | FILED BY | LAURA SMITH |
| PATENT CENTER # | 73489399 | FILING DATE | - |
| CUSTOMER # | 2292 | FIRST NAMED INVENTOR | Heikki Seppa |
| CORRESPONDENCE ADDRESS | - | AUTHORIZED BY | - |

## Documents

# TOTAL DOCUMENTS: 17

| DOCUMENT | PAGES | DESCRIPTION | SIZE (KB) |
|---|---|---|---|
| Certificate of Service 143 EPR.pdf | 1 | Reexam Certificate of Service | 100 KB |
| Ex. A US7724143 Seppa.pdf | 10 | Copy of patent for which reexamination is requested | 1671 KB |
| Ex. B File Wrapper for US Patent 7724143.pdf | 112 | Reexam - Affidavit/Declaration/Exhibit Filed by 3rd Party | 13617 KB |
| Ex. C Supplementary European Search Report 02-07-2014.pdf | 3 | Reexam - Affidavit/Declaration/Exhibit Filed by 3rd Party | 245 KB |
| Ex. D Reply to communication from the Examining Division 08-01-2018.pdf | 4 | Reexam - Affidavit/Declaration/Exhibit Filed by 3rd Party | 339 KB |

| Ex. E Annex to the communication from the Examining Division 12-04-2018.pdf | 4 | Reexam - Affidavit/Declaration/Exhibit Filed by 3rd Party | 317 KB |
| Ex. F 2025-12-08 Expert Declaration.pdf | 45 | Reexam - Affidavit/Declaration/Exhibit Filed by 3rd Party | 2309 KB |
| Ex. G 2025-05-07_Joshua_R_Smith_cv-w-entrepreneurship-w-grants-w-teachingscores.pdf | 55 | Reexam - Affidavit/Declaration/Exhibit Filed by 3rd Party | 1639 KB |
| PA-1 US20020175873A1 King.pdf | 44 | Other reference-Patent/Application/Search Documents | 3819 KB |
| PA-2 US20060032926A1 Baba.pdf | 25 | Other reference-Patent/Application/Search Documents | 2732 KB |
| R-1 RFID Handbook-2003.pdf | 447 | Other reference-Patent/Application/Search Documents | 15468 KB |
| R-2 An_overview_of_backscattered_radio_frequency_identification_system_RFID.pdf | 5 | Other reference-Patent/Application/Search Documents | 672 KB |
| SB-08 - 143 EPR.pdf | 5 | Information Disclosure Statement (IDS) Form (SB08) | 86 KB |

Warning: This is not a USPTO supplied IDS fillable form. Data in the form cannot be automatically loaded to other USPTO systems.

| SB-57 - 143 EPR.pdf | 4 | Reexam Miscellaneous Incoming Letter | 181 KB |
| L1000102272025COMPLAINTforPATENTINFRINGEMENT.pdf | 24 | Other reference-Patent/Application/Search Documents | 2324 KB |
| L2001605052025ANSWERING BRIEF.pdf | 30 | Other reference-Patent/Application/Search Documents | 1161 KB |
| 2025.12.08 Request for Ex Parte Reexamination 143 EPR.pdf | 71 | Receipt of Original Ex Parte Reexam Request | 1950 KB |

**Digest**

| DOCUMENT | MESSAGE DIGEST(SHA-512) |
|---|---|
| Certificate of Service 143 EPR.pdf | 55BCCB3F274316AA45CD9953DE47E478215259763FE8C2FC392AAFEB069FD53493EDE736BA989F3564E517F13674F023607420BCE32BBC8B60A78F8A44BF962F |
| Ex. A US7724143 Seppa.pdf | E5922DFD7CF226F294DD304DBBAC6A40E3540595FC3220F7406EBF72D99F0373B50E4F1DFFFD91C2D414639B6AB986FCB8F96B5665CBE424DABB06904B88DBF1 |
| Ex. B File Wrapper for US Patent 7724143.pdf | E2F73A555C256CF7B4CA3F5D0F4AD4F99DDCCB2C65D954A5E8BB56E307BBB4C06F6E5E75BF62FC671A1865C413292328359FFCC52E75748B7CC43AD5F9CC7056 |
| Ex. C Supplementary European Search Report 02-07-2014.pdf | 563D7DE48B2861B3FAC5FBD7AFA5E28970C25C934D22058BAFCFBA27A70EA63B0631307391408237A5A9194E2BC434043D2BA74040D02A307D1ED0A4D12E377D |
| Ex. D Reply to communication from the Examining Division 08-01-2018.pdf | E94626BDBD78E7134F3A548C63EEB41AB9EBDE0E1C07B486E40E20EE576574BC6CD6BB090545D1B7743245C06DBB7C4220D2E3F5AE88E6B9C63C983386B42ECC |
| Ex. E Annex to the communication from the Examining Division 12-04-2018.pdf | 264A6C94C0F39EBAB3467DA48498109306C1D06028378A25B89988153C78F79F340B8BD01C2A77EFA903807607D26314B650AFACA1B4603840976677D26637AA |
| Ex. F 2025-12-08 Expert Declaration.pdf | D433F5602E15A4605CD5A78BE6A13D129DAAF37381A18F719F0D0703085A2F79B59B20771D8D03A1F1C3AFACEB7839D6843CBB3D83F8B470404F85B2DE7E30F5 |
| Ex. G 2025-05-07_Joshua_R_Smith_cv-w-entrepreneurship-w-grants-w-teachingscores.pdf | 518BAB28E673F067E184819AC49C2969A02D8CEB9F0F756D4A3BA02EA30349C9655B14A69671A3AFEAA1482395B1A162A0EA7B1DB72C664F2DD8B07C50062025 |
| PA-1 US20020175873A1 King.pdf | 9A106FD84A0CBE1EBBD80AB33654D00762474E057654570DA655ECF48DBDD45318DEB8BABAAA07D09EAE97EAC5B0F7E8E620E5B7DED54D025715D56659A0CDA7 |
| PA-2 US20060032926A1 Baba.pdf | 838155E896915A0D8D019BD9AEF450950122D4884E64DB598B40E03F60CEF262C3501D473C65DAB164BD0CEC82CA75C2EC50E344CB0F860193E4663268E89E38 |
| R-1 RFID Handbook-2003.pdf | 493F6B8D430406BDDCCAD2BBCFA6D5E97C60F81E421E491E4E54579B227589E4C0B90BC83FF0982EE4C4AC23FCDFDE26DB42DEE715DE55449236D0EC91D4C580E |
| R-2 | A7815681DD4699D0B556E79E47BF6F41F5CD8146CDFF2BD8 |

| An_overview_of_backscattered _radio_frequency_identification _system_RFID.pdf | 470D6DFAB93707BD4525410E7814DF4BB6AC6E5543124B546 948BCF9E2D9EEEA442167A1BFA334B8 |
| --- | --- |
| SB-08 - 143 EPR.pdf | 45C6945AAD090E4A71CB5685119B46D60338F863060E1823F6 5B1A74D686E07A4714AF874F11DA6C735B3965F2E37ACE135 2E7A5B52693CDDA7F131E2A9A73E5 |
| SB-57 - 143 EPR.pdf | 8781E7B61BB4EB383C8B24C18A87A4357EA947B62E2BF006B C673C821897DDA03834640B8B262A001D5ABEB48A562966EF FC9E1C27BDA52206F38E35957C62D8 |
| L1000102272025COMPLAINTf orPATENTINFRINGEMENT.pdf | 20F202660D37E9B28ACD1273C006C321345ACF10E70AEB1AE 1240F75832BFE46BED69DADA47726B40AF06A42847ABEE2B1 00FE1CD410C47C005D3C9673899A74 |
| L2001605052025ANSWERING BRIEF.pdf | E92AEFD66B344E2CBD6A4AA0DE0CE5F7CCF17354AEFD407 424C703540BD48DBF5C9D0666F3FC8DD10A5BF49D43680163 8BCDC5C8C78A7EE2D2CBDCDBC99B4162 |
| 2025.12.08 Request for Ex Parte Reexamination 143 EPR.pdf | D50994C584DB09BD6871ED9B847A45E75EC026E90F8C7888E C1D14F21AEB4ADA3145FABACDD635C3BB27AD2A6BC453EB 9A5AA6B83C062AB3A5C6953880FB4CD6 |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application

**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.

**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| In re *Ex Parte* Reexamination of: | ) |
| | ) |
| U.S. Patent No. 7,724,143 B2 | ) |
| | ) |
| Issued: May 25, 2010 | ) Group Art Unit: To Be Assigned |
| | ) |
| Named Inventors: Heikki Seppä *et al.* | ) Examiner: To Be Assigned |
| | ) |
| Control Number: To Be Assigned | ) |
| | ) |
| Filed: Herewith | ) |
| | ) |
| Title:  ANTENNA CONSTRUCTION, FOR | ) |
|      EXAMPLE FOR AN RFID | ) |
|      TRANSPONDER SYSTEM | ) |
| | ) |

**Mail Stop *Ex Parte* Reexam**
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

## REQUEST FOR *EX PARTE* REEXAMINATION

HID Global Corporation ("Requester") respectfully request *ex parte* reexamination of claims 1-3, 5-8, 10, 11, 13-15, and 17 of U.S. Patent No. 7,724,143 B2 ("the '143 patent," Ex. A), assigned to VALTION TEKNILLINEN TUTKIMUSKESKUS, or VTT Technical Research Centre of Finland LTD., ("Patent Owner"). Prior art relied on in this Request presents substantial new questions of patentability and renders claims 1-3, 5-8, 10, 11, 13-15, and 17 unpatentable under 35 U.S.C. §§ 102 and 103.

On February 27, 2025, Patent Owner filed a complaint asserting at least claim 1 of the '143 patent against Requester in the lawsuit captioned *VTT Technical Research Centre of Finland, Ltd. v. HID Global Corporation and OMNI-ID USA, Inc.,* Case No. 1:25-cv-00229 (D. Delaware). *See* L-1.

As this Request will demonstrate, the prior art (King and Baba), which was not before the Examiner during prosecution, renders claims 1-3, 5-8, 10, 11, 13-15, and 17 unpatentable. Each of the grounds included in this Request discloses each of the limitations of the independent claim 1 and either anticipates or renders obvious independent claim 1. Further, King either discloses or renders obvious dependent claims 2, 3, 5-8, 10, 11, 13-15, and 17. Baba either discloses or renders obvious dependent claim 6. Thus, the prior art references presented in this Request raise substantial new questions of patentability with respect to these claims.

Accordingly, Requester respectfully requests that the Office grant this Request for *ex parte* reexamination of the '143 patent, reexamine claims 1-3, 5-8, 10, 11, 13-15, and 17 and issue an initial Office Action rejecting claims 1-3, 5-8, 10, 11, 13-15, and 17 over at least the prior art discussed in this Request.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

## Attachments

(1)  Certificate of Service to Patent Owner.

(2)  Information Disclosure Statement and Form PTO/SB/08

## Exhibits

### The '143 Patent, Expert Declaration, and Prosecution History

| | |
|---|---|
| Ex. A | U.S. Patent No. 7,724,143 B2 to Seppä et al. ("the '143 patent") |
| Ex. B | Prosecution History of the '143 patent |
| Ex. C | Supplementary European Search Report dated February 7, 2014, in counterpart European Patent Application No. EP 06743517 |
| Ex. D | Reply to communication from the Examining Division dated August 1, 2018, in counterpart European Patent Application No. EP 06743517 |
| Ex. E | Annex to the communication from the Examining Division, dated December 4, 2018, in counterpart European Patent Application No. EP 06743517 |
| Ex. F | Declaration of Prof. Joshua R. Smith |
| Ex. G | Curriculum Vitae of Prof. Joshua R. Smith |

### Prior Art

| | |
|---|---|
| PA-1 | U.S. Patent Application Publication No. US 2002/0175873 A1 to King et al., filed April 24, 2002, published November 28, 2002 ("King") |
| PA-2 | U.S. Patent Application Publication No. US 2006/0032926 A1 to Baba et al., filed December 8, 2004, published February 16, 2006 ("Baba") |

### Litigation Documents

| | |
|---|---|
| L-1 | Complaint in *VTT Technical Research Centre of Finland, Ltd. v. HID Global Corporation and OMNI-ID USA, Inc.*, Case No. 1:25-cv-00229 (D. Delaware, 2025) |

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

L-2    Opposition to Motion to Dismiss in *VTT Technical Research Centre of Finland, Ltd.*

*v. HID Global Corporation and OMNI-ID USA, Inc.*, Case No. 1:25-cv-00229 (D.

Delaware, 2025)

**Other References**

R-1    Klaus Finkenzeller, *RFID Handbook* (2d ed. 2003)

R-2    K.V.S. Rao, *An Overview of Backscattered Radio Frequency Identification System
(RFID)*, in 1999 Asia Pacific Microwave Conference. APMC'99. Microwaves Enter
the 21st Century. Conference Proceedings 746, 746–749 (1999).

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

     A.     Request for *Ex Parte* Reexamination ................................................ 1

     B.     Certification Regarding Statutory Estoppel Provisions ......................... 1

     C.     The '143 Patent Is Broadly Asserted in Litigation ............................... 1

     D.     Request for Expedited Reexamination ................................................. 2

     E.     Reservation of Rights ......................................................................... 2

II.     OVERVIEW OF THE '143 PATENT AND ITS PROSECUTION HISTORY ............... 3

     A.     Specification ...................................................................................... 3

     B.     Challenged Claims ............................................................................. 5

     C.     Prosecution History ............................................................................ 7

III.     CLAIM CONSTRUCTION ............................................................................. 8

IV.     LEVEL OF ORDINARY SKILL IN THE ART .................................................. 9

V.     OVERVIEW OF THE STATE OF THE ART ..................................................... 9

     A.     Basics of Radio Waves and Role of an Antenna ................................. 9

     B.     Radio Frequency Identification (RFID) Technologies ........................ 11

     C.     The Presence of a Magnetic Field Was Known .................................. 13

     D.     Impedance Matching Was Known ...................................................... 14

VI.     IDENTIFICATION OF PRIOR ART AND EXISTENCE OF SUBSTANTIAL
     NEW QUESTIONS OF PATENTABILITY OF THE CLAIMS OF THE '143
     PATENT ................................................................................................. 14

     A.     Identification of the Prior Art ............................................................ 14

     B.     Overview of the Prior Art .................................................................. 15

           1.     Overview of King (PA-1) ........................................................ 15

           2.     Overview of Baba (PA-2) ........................................................ 16

           3.     Disclosure of Claim Limitations by Multiple Embodiments within
               a Single Prior Art Reference and Motivation to Combine ......................... 19

     C.     Summary of the Substantial New Questions of Patentability .............................. 19

           1.     King Raises a Substantial New Question of Patentability of Claims
               1-3, 5-8, 10, 11, 13-15, and 17 ................................................... 21

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

       2.      Baba Raises a Substantial New Question of Patentability of Claims 1 and 6 ................................................................................ 23

VII.    PROPOSED REJECTIONS OF THE '143 PATENT ...................................... 25

VIII.   DETAILED EXPLANATION OF THE PROPOSED REJECTIONS OF THE CLAIMS OF THE '143 PATENT ................................................................. 25

    A.    Ground 1: Claims 1-3, 5-8, 10, 11, 13-15, and 17 Are Unpatentable over King Under 35 U.S.C. §§ 102 and 103 ................................ 25

        1.     Independent Claim 1 ........................................................ 25

        2.     Claim 2 .............................................................................. 42

        3.     Claim 3 .............................................................................. 43

        4.     Claim 5 .............................................................................. 45

        5.     Claim 6 .............................................................................. 46

        6.     Claim 7 .............................................................................. 47

        7.     Claim 8: ............................................................................. 47

        8.     Claim 10: ........................................................................... 48

        9.     Claim 11 ............................................................................ 48

        10.    Claim 13 ............................................................................ 49

        11.    Claim 14 ............................................................................ 49

        12.    Claim 15 ............................................................................ 50

        13.    Claim 17 ............................................................................ 50

    B.    Ground 2: Claims 1 and 6 Are Unpatentable over Baba Under 35 U.S.C. §§ 102 and 103 ............................................................ 51

        1.     Independent Claim 1 ........................................................ 51

        2.     Claim 6 .............................................................................. 64

IX.    CONCLUSION .................................................................................. 64

## I.    INTRODUCTION

### A.    Request for *Ex Parte* Reexamination

Requester respectfully requests reexamination under 35 U.S.C. §§ 301-307 and 37 C.F.R. § 1.510 *et seq*. of claims 1-3, 5-8, 10, 11, 13-15, and 17 of U.S. Patent No. 7,724,143 B2 (Ex. A, "the '143 patent"), and issuance of a reexamination certificate cancelling these claims. As explained below, the prior art references identified and applied in this Request raise substantial new questions of patentability and render these claims unpatentable.

Requester certifies that a complete copy of this Request has been served via First Class Mail on the record Patent Owner of the '143 patent at the following address:

Valtion Teknillinen Tutkimuskeskus
Vuorimiehentie 3
Espoo
FI-02150

Pursuant to 37 C.F.R. § 1.20(c)(1), Requester is submitting a fee of $13,545. If any additional fees are required to complete this Request, the Office is hereby authorized by the undersigned to charge Deposit Account No. 06-0916 for such fees.

### B.    Certification Regarding Statutory Estoppel Provisions

Pursuant to 37 C.F.R. § l.510(b)(6), Requester hereby certifies that the statutory provisions of 35 U.S.C. § 315(e)(1) and 35 U.S.C. § 325(e)(1) do not bar or prohibit Requester from this *ex parte* reexamination request.

### C.    The '143 Patent Is Broadly Asserted in Litigation

Pursuant to M.P.E.P. § 2282, Requester is aware of the following litigation involving the '143 patent:

| Name | Number | Court | Filed |
|---|---|---|---|
| *VTT Technical Research Centre of Finland, Ltd. v. HID Global Corporation and OMNI-ID USA, Inc.* | 1:25-cv-00229 | D. Delaware | Feb. 27, 2025 |

On February 27, 2025, Patent Owner filed a complaint asserting at least claim 1 of the '143 patent against Requester in the lawsuit captioned *VTT Technical Research Centre of Finland, Ltd. v. HID Global Corporation and OMNI-ID USA, Inc.,* Case No. 1:25-cv-00229 (Delaware). *See* L-1. On April 21, 2025, Requester filed a Motion to Dismiss for Failure to State a Claim.

Requester respectfully requests reexamination of claims, 1-3, 5-8, 10, 11, 13-15, and 17 of the '143 patent. The request shows that the prior art references presented herein present substantial new questions of patentability for these claims, as explained in more detail below in Sections VIand VIII.

### D.     Request for Expedited Reexamination

Due to the ongoing nature of the above-identified lawsuit, Requester respectfully requests that, under 35 U.S.C. § 305, this Request be granted, and reexamination conducted not only with "special dispatch," but also with "priority over all other cases" in accordance with M.P.E.P. § 2261.

### E.     Reservation of Rights

Requester reserves all rights and defenses available, including, without limitation, defenses as to invalidity, unenforceability, and non-infringement regarding the '143 patent. Accordingly, any interpretation or construction of the claims or particular terms, phrases, or clauses made in this proceeding, either implicitly or explicitly, is solely for the purpose of this proceeding and should not be viewed as constituting, in whole or in part, Requester's own interpretation or construction. Moreover, because the *ex parte* reexamination procedure does not permit challenges under 35

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

U.S.C. § 112, Requester has not included any indefiniteness arguments herein. Requester reserves

the right, however, to make such arguments in other proceedings.

## II.    OVERVIEW OF THE '143 PATENT AND ITS PROSECUTION HISTORY

### A.    Specification

The '143 patent discloses an antenna construction for a double-ended antenna circuit for

use in passive RFID (radio-frequency identification) transponders. '143 patent, 1:26-34, Abstract.

An RFID transponder, also known as a tag, can be read remotely by means of a radio signal

delivered by a reading device. *Id.*, 1:12-15. An RFID transponder comprises an antenna, a voltage-

generating circuit, RF-signal modulation/demodulation circuits, and a memory. *Id.*, 1:12-15. The

'143 patent discloses that there are several types of RFID transponders, including passive and

active. *Id.*, 1:17-20. Active transponders have a battery or power supply. *Id.*, 1:22-23. Passive

transponders have no battery and instead generate the electrical energy they need from the radio-

frequency field aimed at them by the reading device. *Id.*, 1:20-22, 1:39-44. The '143 patent

discloses that the most preferred embodiments relate to passive RFID transponders readable using

a radio-frequency radiation field. *Id.*, 1:26-28.

The antenna comprises a conductive ground plane (6) on a first surface, a transmission

line (3) on at least one second surface connected to the ground plane (6) through a fold (1) in the

edge of the antenna construction, an insulation layer (7) arranged between the first and second

surfaces, and an electronic component (4) with a double-terminal antenna connector connected to

the antenna construction. *Id.*, 2:10-14, Abstract, Claim 1, Figs. 2, 3. The electronic component (4),

or RFID circuit, is attached to the second surface and connected from the first antenna terminal to

the transmission line (3) and from the second terminal to either a second transmission (3) line or

the fold (1). *Id.*

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



*Id.*, Figs. 2, 3

Notably, the '143 patent discloses that the fold (1) in the antenna construction that "acts as the primary source of the magnetic field." *Id.*, 3:10-16, 3:24-25, 3:30-31, Abstract, Claim 1. The '143 patent also discloses that the source (2) of the electric field is the open end of the resonator (e.g., antenna construction). *Id.*, 3:10-13, 3:24-25, 3:30-31. In one embodiment, the antenna is shaped in such a way that the transmission is broad at points in which the current density is high but narrow at the maxima (2) of the electric field. *Id.*, 3:33-42, Fig. 4. In many of the embodiments, the position of the RFID circuit or the length of the transmission line is manipulated in order to achieve good impedance matching, e.g., $\lambda/4$ or $\lambda/2$. *Id.*, 3:44-49, 3:55-65, 4:1-2, 4:40-49, Figs. 4, 5.

**B.    Challenged Claims**

The '143 patent includes 17 claims, of which claim 1 is independent. This Request

challenges claims 1-3, 5-8, 10, 11, 13-15, and 17, reproduced below. '143 patent, 6:2-25, 6:32-33,

6:36-37. Dependent claim 2 depends from independent claim 1. Claims 3, 6, and 7 are multiply

dependent on claims 1 or 2. Claims 4, 5, 8, and 11 depend from claim 3. Claims 10 and 13 depend

from claim 5. Claim 14 depends from claim 6. Claim 15 depends from claim 8. Claim 17 depends

from claim 10. These claims are reproduced below.

Claim 1

[1pre] Antenna construction for a double-ended antenna circuit, which comprises:

[1a] a conductive ground place [sic] on a first surface,

[1b] a transmission line on at least one second surface,

[1c] the transmission line connected to the ground plane through a fold in the edge of the antenna construction,

[1d] so that the fold acts as a primary source of a magnetic field,

[1e] an insulation layer arranged between the first and the second surfaces, and

[1f] an electronic component, in which there is a double-terminal antenna connector, connected to the antenna construction,

[1g] wherein the electronic component is attached to the second surface of the antenna construction and

[1h] [the electronic component is] connected from the first antenna terminal to the transmission line and from the second terminal to either a second transmission line or the fold.

Claim 2:

[2pre] Antenna construction according to claim 1,

[2a] wherein the length of the transmission line connected to the first antenna terminal of the component is $\lambda*(2n-1)\frac{1}{4}$, where n=1,2,3.

Claim 3:

[3pre] Antenna construction according to claim 1 or 2, wherein

[3a] the length of the transmission line connected to the second antenna terminal of the component is $\lambda*n\frac{1}{2}$, where n=0,1,2,3.

Claim 5:

[5pre] Antenna construction according to claim 3,

[5a] wherein the second antenna terminal of the component is connected to the transmission line, the length of which is $\lambda*(2n-1)\frac{1}{4}$.

Claim 6:

[6pre] Antenna construction according to claim 1 or 2,

[6a] wherein the component is a passive RFID circuit.

Claim 7:

[7pre] The use of the antenna construction according to claim 1 or 2 as

[7a] the antenna of an RFID circuit.

Claim 8:

[8pre] Antenna construction according to claim 3,

[8a] wherein the component is a passive RFID circuit.

Claim 10:

[10a] Antenna construction according to claim 5,

[10a] wherein the component is a passive RFID circuit.

Claim 11:

[11pre] The use of the antenna construction according to claim 3 as

[11a] the antenna of an RFID circuit.

Claim 13:

[13pre] The use of the antenna construction according to claim 5 as

[13a] the antenna of an RFID circuit.

Claim 14:

[14pre] The use of the antenna construction according to claim 6 as

[14a] the antenna of an RFID circuit.

Claim 15:

[15pre] The use of the antenna construction according to claim 8 as

[15a] the antenna of an RFID circuit.

Claim 17:

[17pre] The use of the antenna construction according to claim 10 as

[17a] the antenna of an RFID circuit.

### C.    Prosecution History

The '143 patent entered the national stage as U.S. Application No. 11/920,235 on November 13, 2007, from corresponding PCT application PCT/FI2006/000149, filed on May 8, 2006, claiming foreign priority from FI 20050507, filed on May 12, 2005. '143 patent, Cover Page. The originally submitted application, accompanied by a concurrently filed preliminary amendment, contained seven claims, as published in pre-grant publication number US2009/0096612A1. Ex. B at 68-67 and 87-88. The Examiner issued a first-action Notice of Allowance on December 31, 2009. *Id.* at 20-25. The Notice of Allowance contained the following Examiner's statement of reasons for allowance:

> "Claims 1-7 have been found to be novel and inventive because prior art fails to show or teach an antenna construction for a double-ended antenna circuit, which comprises a conductive ground place on a first surface, a transmission line on at least one second surface, *the transmission line connected to the ground plane through a fold in the edge of the antenna construction, so that the fold acts as a primary source of a magnetic field,* an insulation layer arranged between the first and the second surfaces, and an electronic component, in which there is a double-terminal antenna connector, connected to the antenna construction, characterized in that *the electronic component is attached to the second surface of the antenna construction and connected from the first antenna terminal*

>*to the transmission line and from the second terminal to either a*
>*second transmission line or the fold.*"

*Id.* at 24, (Emphasis original.)

On March 15, 2010, the Applicant submitted an Amendment After Notice of Allowance, amending each of claims 1-7 and adding new claims 8-17. According to the Applicant, "[t]his Amendment amends claims 1-6 to place them in better form and agreement with U.S. practice, and claims 6-7 to remove improper multiple dependency." *Id.* at 9-14. Regarding claim 6, the Applicant stated that "claim 6 is presently amended to place it in proper multiple dependent form to depend from claim 1 or 2 (which are not multiple dependent claims)," and that "new singly dependent claims 8, 9 and 10 are added to recite the same feature as claim 6 and to depend from claim 3, 4 and 5, respectively." *Id.* at 13. Regarding claim 7, the Applicant stated that "claim 7 is presently amended to place it in proper multiple dependent form and depend from claim 1 or 2 (which are not multiple dependent claims)," and that "new singly dependent claims 11-17 are added to recite the same feature as claim 7 and to depend from claims 3, 4, 5, 6, 8, 9 and 10, respectively." *Id.* The Amendment was entered by the Supervisory Patent Examiner on March 30, 2010. The '143 patent issued on May 25, 2010. *Id.* at 3.

## III.    CLAIM CONSTRUCTION

During reexamination of an unexpired patent, claims are given "the broadest reasonable interpretation consistent with the specification and limitations in the specification are not read into the claims." M.P.E.P. § 2258(I)(G) (citing *In re Yamamoto*, 740 F.2d 1569 (Fed. Cir. 1984)). "Under a broadest reasonable interpretation (BRI), words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification. The plain meaning of a term means the ordinary and customary meaning given to the term by those of ordinary skill in the art at the relevant time. The ordinary and customary meaning of a term may be evidenced by a variety

of sources, including the words of the claims themselves, the specification, drawings, and prior art." M.P.E.P. § 2111.01(I). No terms need construction to resolve the unpatentability issues in this Request. Requester reserves the right to argue alternate claim constructions in other proceedings under *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

Despite the '143 patent being asserted in a district court litigation, the Court has not entered an order for claim constructions. The parties in the parallel district court litigation have not briefed claim construction.

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art ("POSITA") would have at least a bachelor's degree in computer science, computer engineering, electrical engineering, physics, or equivalent, and at least two years of prior work experience with RFID technology, as of the earliest priority date of the '143 patent—May 8, 2006. If a person did not have a bachelor's degree, additional relevant and practical experience with RFID systems could provide an acceptable substitute. Likewise, further education beyond a bachelor's degree could compensate for a deficiency in practical experience. Ex. F, ¶ 24.

## V.    OVERVIEW OF THE STATE OF THE ART

### A.    Basics of Radio Waves and Role of an Antenna

Radio waves are a form of electromagnetic energy that can travel through space and are widely used for wireless communication. RFID Handbook, p. 61. In the context of RFID technologies, radio waves are used for transferring both energy and information between devices. *Id.* at 45. When a radio wave encounters a conductor, such as an antenna, it can induce an electric current, allowing the energy carried by the wave to be harnessed for practical use. *Id.* at 41-43. Ex. F, ¶ 32.

An antenna is a conductor that acts as the interface between radio waves and the electrical circuits within a device. *See* RFID Handbook, at 41-43. An antenna can convert electrical signals from a transmitter into radio waves. Conversely, the antenna can capture radio waves and converts them back into electrical signals. *Id*. The efficiency and effectiveness of this process depend on the antenna's design, including its shape, size, and orientation, as well as the frequency of the radio waves involved. *Id*.; Ex. F, ¶ 33.

The figure below illustrates the role of antennas in an RFID system. On the left, the RFID reader (labeled Base Station) applies signals to its antennas to generate an electromagnetic field. On the right, the transponder antenna (e.g., the tag's antenna) receives energy from this field, powers the chip inside the tag, and selectively reflects the reader's signal to send information via a back-scattered wave (a technique known as modulated backscatter communication). Both the reader and the transponder rely on their respective antennas to enable this wireless exchange of energy and information.



*See* K.V.S. Rao, *An Overview of Backscattered Radio Frequency Identification System (RFID)*, *in* 1999 Asia Pacific Microwave Conference. APMC'99. Microwaves Enter the 21st Century. Conference Proceedings 746, 746–749 (1999); *see also* Ex. F, ¶ 34.

The frequency of the radio waves used in RFID systems can vary. The choice of frequency affects not only the range and speed of communication but also the size and type of antenna required. For example, lower frequencies typically require larger antennas, while higher frequencies allow for smaller, more compact antenna designs. RFID Handbook, pp. 41-42, 65-66; Ex. F, ¶ 35.

### B.    Radio Frequency Identification (RFID) Technologies

Radio Frequency Identification (RFID) technology uses radio waves to transfer data between a tag, or a transponder, and a reader for identification and tracking. RFID technology has been used in a wide variety of sectors for applications as diverse as tracking inventory through the supply chain, livestock and pet identification, contactless card reading, key fobs, retail anti-theft devices, and as automatic referees for sporting events. RFID Handbook, pp. 363-364, 364-372, 341-342, 358-360, 31-32, 379-381. An RFID system is always made up of at least two components (Figure 1.7):

- the *transponder*, which is located on the object to be identified;

- the interrogator or *reader*, which, depending upon the design and the technology used, may be a read or write/read device.



**Figure 1.7**    The reader and transponder are the main components of every RFID system

RFID Handbook at 7, Fig. 1.7; Ex. F, ¶ 36.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

The transponder and the reader both require their own antenna to communicate with each other. For example, a reader typically contains a radio frequency module (transmitter and receiver), a control unit and a coupling element (e.g., antenna) to the transponder. The transponder, which represents the actual *data-carrying device* of an RFID system, normally consists of a coupling element (e.g., antenna) and an electronic *microchip* (Figure 1.9). RFID Handbook, at 7. Coupling is the process of transferring energy and data between the RFID tag and the reader, while the coupling element, such as an antenna, is the physical component that facilitates this transfer.



**Figure 1.9**   Basic layout of the RFID data-carrying device, the transponder. Left, inductively coupled transponder with antenna coil; right, microwave transponder with dipolar antenna

*Id.* Fig. 1.9; Ex D, ¶ 37.

Depending on whether a transponder has its own power supply, it may be an active transponder (with its own power supply) or a passive transponder (without its own power supply). Active transponders incorporate a battery, which supplies all or part of the power for the operation of the microchip. Passive transponders do not have their own power supply so all power required for their operation must be drawn from the electromagnetic field of the reader. RFID Handbook, at 13; Ex. F, ¶ 38.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

When a passive transponder or tag is not within an interrogation zone or "read zone" of a reader, it is totally inactive. *Id.* at 8. The transponder is only activated when it is within the interrogation zone of a reader. *Id.* The power required to activate the transponder is supplied to the transponder through the coupling unit (contactless), as are the timing pulse and data. *Id.* In other words, passive RFID tags rely on electrical signals induced by a reader's electromagnetic field to power the chip and transmit data. RFID Handbook, p.8; Ex. F, ¶ 39.

A passive RFID tag generally has an antenna and a microchip, connected by transmission lines, otherwise known as feed lines. Antennas are configured to capture radio waves sent by a reader. Additionally, RFID tags may contain other components for the proper functioning of the electronics, such as a ground plane and various grounding elements or lines. Furthermore, it was known that RFID tags could be applied to numerous surfaces, including insulating or dielectric materials, such as the plastic card used in contactless card reader systems. RFID Handbook at 341-342; Ex. F, ¶ 40.

### C.    The Presence of a Magnetic Field Was Known

The '143 patent purports that the fold in the antenna structure acts as the primary source of the magnetic field. '143 patent, 3:9-16; *see also* cl. 8-10. However, this is a mischaracterization of how passive RFID tags work. Ex. F, ¶ 41.

When a powered reader excites a passive tag, the electromagnetic field generated by the reader transmits power by induction through the tag's coupling element, which is typically an antenna. RFID Handbook at 8. The transmitted power then powers the microchip through transmission lines for further data exchange with the reader. *Id.* 125-127; Ex. F, ¶ 42.

### D.    Impedance Matching Was Known

Impedance matching is a fundamental principle in antenna engineering. It is the practice of designing the antenna and the transmission line (the path from the communication chip/transmitter to the antenna) so that the impedance of the antenna is matched to the impedance of the system (typically the chip/transmitter). Ex. F, ¶ 43.

According to Maximum Power Transfer Theorem, to transfer the maximum amount of power from a source (e.g., an antenna) to a load (e.g., a chip), the load impedance must be the complex conjugate of the source impedance. The antenna's impedance must be matched to that of the source to achieve maximum power transfer. Ex. F, ¶ 44.

Placing a quarter-wavelength conductor (i.e., the antenna element) over a ground plane (i.e., a large, flat, conductive surface) is a very common and effective design choice because this structure can provide the necessary impedance required for efficient matching. The particular impedance can be controlled by geometrical factors such as the exact position of other electrical components (e.g., the chip) along the quarter wavelength section, the spacing to the ground plane, and others.  Ex. F, ¶ 45.

## VI.    IDENTIFICATION OF PRIOR ART AND EXISTENCE OF SUBSTANTIAL NEW QUESTIONS OF PATENTABILITY OF THE CLAIMS OF THE '143 PATENT

### A.    Identification of the Prior Art

The '143 patent entered the national stage as U.S. Application No. 11/920,235 on November 13, 2007, from corresponding PCT application PCT/FI2006/000149, filed on May 8, 2006, which claimed foreign priority from FI 20050507, filed on May 12, 2005. '143 patent, Cover Page. Thus, the earliest possible priority date for all the claims of the '143 patent is May 8, 2006. *See* 35 U.S.C. § 119(a).

Reexamination of the '143 patent is requested in view of the following patents or printed publications that are prior art to the '143 patent:

| | | |
|---|---|---|
| PA-1 | | U.S. Patent Application Publication No. US 2002/0175873 A1 to King et al., filed April 24, 2002, published November 28, 2002 ("King") |
| PA-2 | | U.S. Patent Application Publication No. US 2006/0032926 A1 to Baba et al., filed December 8, 2004, published February 16, 2006 ("Baba") |

These patents or printed publications were not previously considered by the Examiner during the prosecution of the '143 patent and are listed on a form PTO/SB/08 filed concurrently herewith. Copies of these listed references are attached.

## B. Overview of the Prior Art

### 1. Overview of King (PA-1)

King was filed on April 24, 2002, and published on November 28, 2002. King, Cover Page. King was published over one year before the priority date of the '143 patent and thus qualifies as prior art under pre-AIA 35 U.S.C. §§ 102(a), (b), or (e).

King discloses multiple embodiments for a wireless communication device 1000, including a passive RFID tag. For example, one of the embodiments comprises a substrate 1002, a ground plane 1004, a wireless communication chip 1006, a feed line 1008, a chip grounding line 1010, an antenna 1012, and an antenna grounding element 1014. King, ¶¶ [0104]-[0106], Fig. 18. King discloses that the antenna 1012 may be a quarter wavelength long for the desired operating frequency. *Id.* ¶ [0111]. The distance is measured from first end 1016 to second end 1018. *Id.*, Fig. 18.

15

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



*Id.*, Fig. 18; Ex. F, ¶ 57; Ex. F, ¶ 57.

King is analogous art to the '143 patent. Like the '143 patent, King relates to design of antenna structures for wireless communication devices, including those used for tracking and identifying items such as packages and containers via radio frequency identification (RFID) technology, and thus is from the same field of endeavor. *See* King, ¶¶ [0003]-[0006]. Moreover, King is reasonably pertinent to the particular problem with which the inventor is involved: improving the design of antenna systems for multiple reasons, including, addressing challenges when devices are attached to packaging made of conductive materials (e.g., foil), enhancing impedance matching, and improving tag manufacture efficiency. *See id.*; Ex. F, ¶ 87.

For the reasons stated above, a POSITA would have been motivated to implement King's antenna structures, which anticipate or render obvious the structures of the '143 patent; Ex. F, ¶ 88.

### 2. Overview of Baba (PA-2)

Baba was filed on December 08, 2004, and published on February 16, 2006. Baba, Cover Page. Baba was filed and published before the priority date of the '143 patent and thus qualifies as prior art under pre-AIA 35 U.S.C. §§ 102(a) or (e).

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

In many of the embodiments disclosed by Baba, the antenna structure is wrapped or folded around a dielectric member. *Id*., ¶¶ [0014]-[0016]; Figs 1, 4, 6-9, 11, 13-14, 16, 18, 20-23. One example is an embodiment as shown in Figure 4. Baba discloses an embodiment of an antenna 5, on a dielectric member 10, that transmits and receives data via an integrated circuit (IC) chip 40. An antenna pattern 30 is wrapped around the surface of the dielectric member 10, and the IC chip is electrically connected to the antenna through chip pads 32. *Id.* ¶¶ [0060], [0064]; Fig. 4.



*Id.* Fig. 4 (annotated).

Another exemplary embodiment is shown in Figure 9 reproduced below. Baba discloses an antenna structure that connects the antenna 30 and chip pads 32 to the chip 40, and the position of the feeding point may be changed to adjust the antenna response. *Id*., ¶¶ [0006], [0070]-[0077], [0079], [0128].

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



Baba, Fig. 9 (annotated); Ex. F, ¶ 90-101.

Baba, therefore, discloses or renders obvious all elements of claims 1 and 6 of the '143 patent.

Baba is analogous art to the '143 patent. Like the '143 patent, Baba relates to design and construction of antenna structures for wireless communication devices, including those used in passive RFID tag technology, and thus is from the same field of endeavor. *Id.*, ¶¶ [0002], [0003]. Moreover, Baba is reasonably pertinent to the particular problem with which the inventor is involved: improving the design of antenna systems for multiple reasons, including focusing on improving communication reliability and durability, especially when tags are mounted on or near wave-absorbing materials such as bottles or the human body, enhancing antenna response, and improving tag manufacture efficiency. *Id.*, ¶¶ [0005], [0009], [0010], [0017]; Ex. F, ¶ 115.

For the reasons stated above, a POSITA would have been motivated to implement Baba's antenna structures, which anticipate or render obvious the structures of the '143 patent. Ex. F, ¶ 116.

### 3. Disclosure of Claim Limitations by Multiple Embodiments within a Single Prior Art Reference and Motivation to Combine

The embodiments disclosed within a single prior art reference (Baba or King) individually disclose all limitations of the claimed invention. Alternatively, to the extent that any single embodiment does not expressly disclose every limitation, it would have been obvious to a person of ordinary skill in the art to combine features from separate embodiments to arrive at the claimed invention. The Federal Circuit has held that obviousness under 35 U.S.C. § 103 may be established by combining elements from distinct embodiments within the same prior art reference, so long as such a combination would be predictable to one of ordinary skill in the art. *See Bos. Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 990 (Fed. Cir. 2009)

Consistent with the rationale set forth in *KSR Int'l Co. v. Teleflex Inc.*, combining prior art elements according to known methods to yield predictable results is a recognized basis for obviousness. 550 U.S. 398, 416-18 (2007). The configurations presented in the prior art references—including variations in antenna structure, chip connection, and substrate—are described as design choices that may be selected and modified according to known engineering practices to suit the requirements of a particular antenna devices, such as adapting to the physical constraints of the object to which the tag is affixed or optimizing for a desired operating frequency or antenna size. The ability to select and combine features from separate embodiments to achieve a specific functional or performance objective is well within the routine skill of practitioners in the field, and such combinations would be expected to yield predictable results.

### C. Summary of the Substantial New Questions of Patentability

The determination of whether to grant or deny an order for reexamination is based on the presence or absence of a "substantial new question of patentability." 35 U.S.C. § 303(a); *see also* M.P.E.P. § 2242(I), § 2216. "If . . . the Director finds that a substantial new question of

patentability affecting *any* claim of a patent is raised, the determination *will* include an order for reexamination of the patent for resolution of the question." 35 U.S.C. § 304 (emphases added); *see also* M.P.E.P. § 2240.

For "a substantial new question of patentability" to be present, it is only necessary that: (A) the prior art patents and/or printed publications raise a substantial question of patentability regarding at least one claim— the teaching of the prior art is such that a reasonable examiner would consider the teaching to be important in deciding whether or not the claim is patentable; and (B) the same question of patentability as to the claim has not been decided by the Office in an earlier concluded examination or review of the patent, raised to or by the Office in a pending reexamination or supplemental examination of the patent, or decided in a final holding of invalidity (after all appeals) by a federal court in a decision on the merits involving the claim. M.P.E.P. § 2242(I).

The existence of "a substantial new question of patentability" is not precluded by the fact that the prior art was "previously cited by or to the Office or considered by the Office. 35 U.S.C. § 303 (a); *see also* M.P.E.P. § 2242(II)(A) ("[R]eliance on old art does not necessarily preclude the existence of a substantial new question of patentability that is based exclusively on that old art. *See* Public Law 107-273, 116 Stat. 1758, 1899-1906 (2002), which expanded the scope of what qualifies for a substantial new question of patentability upon which a reexamination may be based."); M.P.E.P. § 2216 ("[A] substantial new question of patentability can be raised by patents and printed publications 'previously cited by or to the Office or considered by the Office' ("old art")").

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

Here, this Request presents substantial new questions of patentability because the prior art provides new teachings and combinations that are important to the patentability of claims 1-3, 5-8, 10, 11, 13-15, and 17 based on prior art not considered during prosecution of the '143 patent.

For reasons summarized below and explained in further detail within the entirety of this Request, (1) King raises a substantial new question of patentability of claims 1-3, 5-8, 10, 11, 13-15, and 17 of the '143 patent; and (2) Baba raises a substantial new question of patentability of claims 1 and 6 of the '143 patent.

### 1.    King Raises a Substantial New Question of Patentability of Claims 1-3, 5-8, 10, 11, 13-15, and 17

King anticipates claims 1-3, 5-8, 10, 11, 13-15, and 17 and was not previously considered by the Office during prosecution of the '143 patent. So it raises a substantial new question of patentability of claims 1-3, 5-8, 10, 11, 13-15, and 17.

King was not considered by the Examiner. Ex. B at 26. Applicant did not cite King among four references listed in an information disclosure statement ("IDS") submitted with application documents during national stage entry. *Id.* at 59. The patent was granted by the Examiner with a first action allowance. *Id.* 20-26. In contrast, the European Patent Examiner for the associated EP patent application (EP 06743517.2) cited King as the first reference, D1, in their rejection of the application. Ex. C at 1.

King describes multiple embodiments of a wireless communication device, including a passive RFID tag, that include all the structural elements recited in the '143 patent. These embodiments feature a substrate, a ground plane, an antenna, and a transmission line, with the antenna and ground plane connected through a fold at the edge of the antenna construction. King further teaches that the antenna and ground plane can be formed from a single conductive piece wrapped around the substrate, and that the chip component is similarly positioned to maintain

electrical connection. This configuration satisfies the claimed arrangement by providing the required conductive paths and structural relationships within the antenna edge.

Notably, in the Notice of Allowance, the Examiner highlighted "the transmission line connected to the ground plane through a fold in the edge of the antenna construction, so that the fold acts as a primary source of a magnetic field" and "the electronic component is attached to the second surface of the antenna construction and connected from the first antenna terminal to the transmission line and from the second terminal to either a second transmission line or the fold." Ex. B at 24.

King anticipates both. First, King discloses multiple embodiments that disclose "the transmission line connected to the ground plane through a fold in the edge of the antenna construction," including Figures 18, 19, 21, 22, and 28, each showing a transmission line (e.g., antenna 1012) connected to the ground plane through a fold (e.g., fold 1014). Patent Owner's own statements in parallel litigation establish that, if the fold structure is present as claimed, "the fold acts as a primary source of a magnetic field." Therefore, the Patent Owner appears to agree that King discloses "the fold acts as a primary source of a magnetic field." L-2 at 14-18; *see also Shockwave Medical, Inc. v. Cardiovascular Systems, Inc.*, 1371, 1380 (Fed. Cir. 2025) (held that patent owner statement can be used as evidence of general background knowledge to supply missing claim limitations).

Second, King discloses multiple embodiments that discloses "the electronic component is attached to the second surface of the antenna construction and connected from the first antenna terminal to the transmission line and from the second terminal to either a second transmission line or the fold." In one exemplary embodiment as shown in Figure 18, the wireless communication chip 1006 (i.e., electronic component) is physically positioned on the second surface of the

substrate 1002, and next to the antenna 1012. King, ¶ [0108]; Fig. 18. The feed line 1008 is also disposed on this second surface, and the electronic component is directly connected to these elements. *See id*. The chip is positioned on the second surface of substrate 1002 and connected to the antenna 1012 (i.e., transmission line) from a terminal on the left side of the chip via a feed line 1008. *Id.* ¶ [0108]; Fig. 18. The chip is also connected to a second transmission line (i.e., grounding line 1010) from a second terminal on the right side of the chip. *Id.* ¶¶ [0109]; Fig. 18.

Accordingly, King raises a substantial new question of patentability of claims 1-3, 5-8, 10, 11, 13-15, and 17 of the '143 patent not previously considered or decided by the Office.

### 2. Baba Raises a Substantial New Question of Patentability of Claims 1 and 6.

Baba renders obvious claims 1 and 6 and was not previously considered or decided by the Office during prosecution of the '143 patent. So it raises a substantial new question of patentability of claims 1 and 6.

Baba was not considered by the Examiner. Ex. B at 26. Applicant did not cite Baba among four references listed in an IDS submitted with application documents during national stage entry. *Id.* at 59 The patent was granted by the Examiner with a first action allowance. *Id.* at 20-26.

Baba teaches multiple embodiments of an antenna that include the structural features required by the '143 patent. The disclosed tag comprises a dielectric member, an antenna wrapped or folded around its surface, and an integrated circuit chip electrically connected to the antenna through chip pads. Baba further explains that the antenna structure is formed by wrapping or folding conductive material around the dielectric member, creating a fold in the antenna edge. This configuration provides the claimed arrangement by positioning the antenna and its connection points at the edge and enabling electrical coupling through the fold.

Notably, in the Notice of Allowance, the Examiner highlighted "the transmission line connected to the ground plane through a fold in the edge of the antenna construction, so that the fold acts as a primary source of a magnetic field" and "the electronic component is attached to the second surface of the antenna construction and connected from the first antenna terminal to the transmission line and from the second terminal to either a second transmission line or the fold." Ex. B at 24.

Baba anticipates both. First, Baba discloses multiple embodiments that disclose "the transmission line connected to the ground plane through a fold in the edge of the antenna construction," including Figures 1, 4, 8-14, 16, 17, and 20-23, each showing antenna constructions with an antenna pattern 30 (i.e., transmission line) connected to the ground plane through a fold 22 on the edge of the antenna construction. For example, in Figure 9, the antenna pattern 30 (i.e., transmission line) runs along the second surface of the dielectric member 10 and is connected to the chip 40. Baba ¶ [0072]; Fig. 9. Notably, the antenna pattern 30 (i.e., transmission line) is routed to the edge of the antenna structure, where it is electrically connected through a fold 22 to the conductive ground plane located on the first surface, enabling current to flow and complete the antenna circuit. *Id.* Patent Owner's own statements in parallel litigation establish that, if the fold structure is present as claimed, "the fold acts as a primary source of a magnetic field." Therefore, the Patent Owner appears to agree that King discloses "the fold acts as a primary source of a magnetic field." L-2 at 14-18; *see also Shockwave Medical, Inc. v. Cardiovascular Systems, Inc.*, 1371, 1380 (Fed. Cir. 2025) (held that patent owner statement can be used as evidence of general background knowledge to supply missing claim limitations).

Second, Baba discloses multiple embodiments, for example, Figures 1, 4-14, and 16-25, that disclose "the electronic component is attached to the second surface of the antenna

construction and connected from the first antenna terminal to the transmission line and from the

second terminal to either a second transmission line or the fold." Baba, Figs. 1, 4-14, 16-25. For

example, an exemplary Figure 9 shows an antenna construction wherein the electronic component

is attached to the second surface of the antenna construction and connected from the first antenna

terminal to the transmission line and from the second terminal to either a second transmission line

or a fold. *Id.* Fig. 9.

Accordingly, Baba raises a substantial new question of patentability of claims 1 and 6 of

the '143 patent not previously considered or decided by the Office.

## VII.    PROPOSED REJECTIONS OF THE '143 PATENT

The following rejections are proposed in this Request for claims 1-3, 5-8, 10, 11, 13-15,

and 17 of the '143 patent:

- **Ground 1:** Claims 1-3, 5-8, 10, 11, 13-15, and 17 are unpatentable over King under 35 U.S.C. §§ 102 and 103.
- **Ground 2:** Claims 1 and 6 are unpatentable over Baba under 35 U.S.C. §§ 102 and 103.

## VIII.   DETAILED EXPLANATION OF THE PROPOSED REJECTIONS OF THE CLAIMS OF THE '143 PATENT

### A.    Ground 1: Claims 1-3, 5-8, 10, 11, 13-15, and 17 Are Unpatentable over King Under 35 U.S.C. §§ 102 and 103

#### 1.    Independent Claim 1

##### a)    [1pre]: "Antenna construction for a double-ended antenna circuit, which comprises. . ."

To the extent the preamble is limiting, King discloses an "antenna construction for a

double-ended antenna circuit." *See* King, Abstract, ¶ [0011]; Figs. 4A-4B. King discloses a

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

wireless communication device comprising an antenna having two ends, one of which is shorted

to a ground plane and the other end being an open circuit. King, Abstract, ¶¶ [0008], [0009].

For example, Figure 18 of King as reproduced below illustrates an antenna construction

for a double-ended antenna circuit. The chip 1006 is connected to both an antenna element 1012

and a grounding line 1010, thus forming the double-ended antenna configuration. *Id.* ¶ [0110];

Fig. 18. The antenna element 1012 is a planar transmission line, which is formed on the top of

insulation later 1002; the grounding line 1010 connects to the ground plane 1004 of the antenna

structure 1000. *Id.* ¶ [0110]; Fig. 18.



*Id.*, Fig. 18; Ex. F, ¶ 58.

As another example, Figure 28 of King, reproduced below, illustrates an antenna

construction for a double-ended antenna circuit. The chip 1006 is connected to both an antenna

element 1012 and a grounding line 1010, thus forming the double-ended antenna configuration.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

King, Fig. 28. The antenna element 1012 is a planar transmission line, which is formed on the top of insulation layer 1002; the grounding line 1010 connects to the ground plane 1004 of the antenna structure 1000. *Id.*



*Id.*, Fig. 28; Ex. F, ¶ 65.

King further discloses multiple embodiments that meet this element, including Figures 19-24 and 26-28, each showing antenna constructions with two distinct electrical ends, consistent with the preamble of claim 1.

### b)  [1a]: "a conductive ground pla[n]e on a first surface" [1]

King discloses element [1a]. Specifically, King discloses a conductive strip serving as a ground plane. *Id.*, Abstract, ¶¶ [0009], [0015], [0092]; Figs. 18-19, 21-28, cl. 16. As shown below, King discloses that the ground plane 1004 may be a foil tape, a conductive material secured to the substrate 1002, i.e., a first surface, or another conductive surface. *Id.*, ¶ [0106], Fig. 18.

---

[1] Note that it is assumed that the word "place" as it initially appears in claim 1 is a typographical error and is interpreted as "plane", to maintain consistency with its usage throughout the remainder of the claim and the specification.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



*Id.*, Fig 18 (annotated); Ex. F, ¶ 59.

Figure 26 of King further discloses the element because, like Figure 18, element 1004 is expressly identified as the ground plane and is positioned on one surface of the substrate 1002. The antenna element 1012 is located on a different surface, separated by the substrate made out of any suitable dielectric material, which functions as an insulation layer. King, ¶¶ [0125]-[0129]; Fig. 26. This arrangement discloses the claim requirement that the ground plane be on a first surface of the antenna construction.



King, Fig. 26 (annotated); Ex. F, ¶ 60.

King further discloses multiple embodiments that anticipate this element, including Figures 18-19 and 23-28, each showing a conductive ground plane on a first surface consistent with the element. Further, throughout King's disclosure, "a conductive ground plane on a first surface" is taught. For example, the specification states, "a ground plane (not shown) may be placed on the opposite side of substrate 202, so that substrate 202, acting as a dielectric 102, is in between transponder 10 and the ground plane. Note that the ground plane may be placed on other places on substrate 202 and not necessarily on the opposite side from transponder 10." King, ¶ [0092]; Ex. F, ¶ 61.

Further, the claims in King repeatedly recite the usage of a ground plane positioned as a first surface. For example, claim 2 states "said wireless communication chip is positioned on *a first side of said substrate and said ground plane is positioned on an opposite side of said substrate*." King, cl. 2 (emphasis added). Further, claim 16 illustrates the conductive property by stating, "[the] ground plane [is] cut from a unitary piece of *conductive* foil. *Id*., cl. 16 (emphasis added). Therefore, King discloses a conductive ground plane arranged as part of an antenna construction for a double-ended antenna circuit. *See, e.g.*, King, Abstract, ¶¶ [0104], [0122]; cl. 1-5, 18.

### c) [1b]: "a transmission line on at least one second surface"

King discloses element [1b]. King discloses multiple embodiments that disclose "a transmission line on at least one second surface," including Figures 18-20, 23-25, and 27-28, each showing a transmission line (e.g., antenna 1012) on a second surface consistent with this claim element. King, ¶¶ [0104], [0106]; Fig. 18. King is explicit about the ground plane 1004 and the antenna 1012 being on opposite sides of the substrate 1002. For example, King discloses that "the ground plane 1004 is parallel to the antenna 1012 opposite the antenna 1012." *Id.* ¶ 0106]; Fig. 18.

29

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



King, Fig. 18 (annotated); Ex. F, ¶ 62.

> ### d) [1c]: "the transmission line connected to the ground plane through a fold in the edge of the antenna construction"

King discloses element [1c]. King discloses multiple embodiments that disclose "the transmission line connected to the ground plane through a fold in the edge of the antenna construction," including Figures 18, 19, 21, 22, and 28, each showing a transmission line (e.g., antenna 1012) connected to the ground plane through a fold (e.g., fold 1014) consistent with this claim element. Ex. F, ¶ 63.

As shown in Figure 18 reproduced below, King discloses that both the chip grounding line 1010 and antenna grounding element 1014 connect to the ground plane 1004. King, ¶¶ [0109], [0110]; Fig. 18. The antenna 1012 may be short-circuited to the ground plane 1004 via the antenna grounding element 1014. *Id.*, ¶ [0110]; Fig. 18. King further discloses the antenna grounding

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

element 1014 as a conductive strip wrapping around the edge of the substrate to connect the antenna and the ground plane (i.e., connection through a fold). *Id.*



King, Fig. 18 (annotated); Ex. F, ¶ 64.

Similarly, as another example, Figure 28 of King illustrates an antenna construction that also meets the element. Similar to Figure 18, Figure 28 reproduced and annotated below shows the antenna 1012 (i.e., the transmission line) positioned on a second surface of the substrate 1002, while the ground plane 1004 resides on the opposite surface of the substrate 1002. King, ¶ [0129]; Fig. 18. The antenna 1012 (i.e., transmission line) is electrically connected to the ground plane 1004 by the grounding element 1014 located at the edge of the structure, which is shown as a fold wrapping around the edge. *Id.*

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



King, Fig. 28 (annotated); Ex. F, ¶ 65.

### e) [1d]: "so that the fold acts as a primary source of a magnetic field"

King inherently discloses element [1d]. Patent Owner has taken the position in litigation that the fold "acts as a primary source of a magnetic field" by nature of the antenna structure as described in the claim. *See* L-2, at 14-18. As stated by the Patent Owner, "[magnetic] concentration results from the geometry and current path. . . ."[2] *Id.* at 17-18. Further, according to the Patent Owner, "structural features—like the fold—support circulating currents that generate magnetic field components capable of radiating effectively into space."[3] *Id.* at 16.

---

[2] This statement is cited to the Office pursuant to 35 U.S.C. § 301(a)(2).

[3] Requester notes that there is no claim construction in the district court yet. Parties in the litigation has not briefed on claim construction, either.

During litigation, the Patent Owner stated, "[t]he 'fold' structure concentrates received energy and facilitates the formation of a resonant current distribution that produces the magnetic field component of the emitted radiation." L-2, at 16. Prof. Smith explains that, in the view of a person of ordinary skill in the art ("POSITA"), the Patent Owner's statement is understood to mean that simply including a fold in the antenna structure inherently causes the fold to function as "a primary source of a magnetic field." Ex. F ¶ 53. This technical explanation, provided by the Patent Owner, confirms that the claimed fold structure results in the formation of a magnetic dipole, which is responsible for the antenna's radiative properties. *Id.* ¶ 54.

Taken together, the Patent Owner's own statements establish that, if the fold structure is present as claimed, "the fold acts as a primary source of a magnetic field." Thus, in line with the Patent Owner's own statements, any prior art structure implementing such a fold will necessarily possess these properties. *Id.* ¶ 55; *see Shockwave Medical, Inc. v. Cardiovascular Systems, Inc.*, 1371, 1380 (Fed. Cir. 2025) (held that patent owner statements can be used as evidence of general background knowledge to supply missing claim limitations).

As discussed in Section VIII.A.1(d), King discloses the fold structure in multiple embodiments. For example, Figure 26 of King shows a profile view of an antenna structure. As shown below, King's antenna grounding element 1004 is "illustrated as a conductive strip wrapping around the edge." King, ¶ [0110].

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



*Id.*, Fig. 26 (annotated); Ex. F, ¶ 67.

Other embodiments in King also illustrate a fold and, according to the Patent Owner, would lead to meeting the claim element "so that the fold acts as a primary source of a magnetic field." These other embodiments include Figures 18-19 and 21-28, each showing a fold consistent with this claim element. Ex. F, ¶ 68.

Further, claim 1 is an apparatus claim. In alignment with Patent Owner's statements, this claim element is written in *functional* terms, rather than in structural terms. As stated in the MPEP, "[A]pparatus claims cover what a device *is*, not what a device *does*." *Hewlett-Packard Co.v.Bausch & Lomb Inc.*, 909 F.2d 1464, 1469, 15 USPQ2d 1525, 1528 (Fed. Cir. 1990) (emphasis in original). A claim containing a "recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the <u>structural</u> element of the claim. *Ex parte Masham*, 2 USPQ2d 1647 (Bd. Pat. App. & Inter. 1987). *See* MPEP § 2114.II.

Under the Patent Owner's interpretation, because King discloses all the structural limitations of the apparatus of claim 1, it follows that the apparatus disclosed by King would

perform the same functions, i.e., the fold of King's apparatus would also act, or *function*, as a primary source of a magnetic field. Ex. F, ¶ 69.

### f) [1e]: "an insulation layer arranged between the first and the second surfaces"

King discloses element [1e]. King discloses a substrate 1002 that can be almost any type of dielectric material, i.e., an insulator, and discloses that polypropylene or comparable plastics are preferred. *Id.*, ¶¶ [0104], [0105], [0125]; Figs. 18, 27. As shown in the figures reproduced and annotated below, this substrate is between the first surface, which houses the ground plane 1004 and the second surface, which is home to the transmission lines (i.e., antenna 1012). *Id.* ¶¶ [0104], [0106], [0125]; Figs. 18, 27; Ex. F, ¶ 70.



King, Fig. 18 (annotated); Ex. F, ¶ 70.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



King, Fig. 28 (annotated); Ex. F, ¶ 70.

Further, as shown below, King discloses the element "an insulation layer arranged between the first and the second surfaces." For example, King discloses substrate 1002 acting as an insulation layer positioned between the first surface as the ground plane 1004 and the second surface carrying the electronic component or integrated circuit 1012. King, ¶ [0127]; Fig. 26. This arrangement satisfies the claimed requirement of an insulation layer between the first and second surfaces. Likewise, in Figure 3 of the '143 Patent, the insulation layer separates the first surface (the ground plane) from the second surface (with the transmission line). Ex. F, ¶ 127.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



'143 Patent, Fig. 3 (annotated); King, Fig. 26 (annotated).

King further discloses multiple embodiments that meet this element, including Figures 18-19 and 23-28, each showing antenna constructions with two distinct electrical ends consistent with claim 1. Ex. F, ¶ 72.

### g) [1f]: "an electronic component, in which there is a double-terminal antenna connector, connected to the antenna construction"

King discloses element [1f]. King discloses a wireless communication chip 1006, i.e., an electronic component, which may comprise a control system, memory, battery, sensor, and other conventional components. King, e.g., ¶¶ [0104], [0107]; Fig. 18; Ex. F, ¶ 73.

Figure 18 of King, as reproduced and annotated below, discloses an antenna construction with both the left side and the right side (i.e., antenna connectors) of the electronic component (i.e., wireless communication chip 1006) connected to the antenna construction (e.g., feed line 1008 and chip grounding line 1010 as part of the antenna construction) through antenna connectors. King, ¶¶ [0104], [0108], [0109]; Fig. 18. Thus, King discloses the same structural and functional configuration as the claimed double-terminal antenna connector. Ex. F, ¶ 74.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



King, Fig. 18 (annotated); Ex. F, ¶ 74.

Further, the claims in King repeatedly recite connection of an electronic component using multiple connection points. For example, claim 18 states "a chip component comprising a feed line, a chip grounding line, and a wireless communication chip . . . the chip is grounded by the chip grounding line and coupled to said antenna by said feed line." King, cl. 18. This language shows that the chip is connected to the antenna construction at two separate points: one terminal (the feed line) couples the chip to the transmission line (antenna), while the other terminal (the grounding line) connects the chip to the ground plane. Accordingly, King provides an express disclosure of an electronic component with a double-terminal antenna connector connected to the antenna construction. Ex. F, ¶ 75.

### h)  [1g]: "wherein the electronic component is attached to the second surface of the antenna construction"

King discloses element [1g]. In Figure 18 as reproduced and annotated below, the wireless communication chip 1006 (i.e., electronic component) is physically positioned on the second

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

surface of the substrate 1002, and next to the antenna 1012. King, ¶ [0108]; Fig. 18. The feed line

1008 is also disposed on this second surface, and the electronic component is directly connected

to these elements. *See id*.



*Id.* Fig. 18 (annotated); Ex. F, ¶ 76.

Similarly, in Figure 28 as reproduced and annotated below, the wireless communication

chip 1006 (i.e., electronic component) is also physically positioned on the second surface of the

substrate 1002. *Id.*, ¶ [0108]; Fig. 28. The feed line 1008 is also disposed on this second surface,

and the electronic component is directly connected to these elements. *See id*. King explicitly

explains this attachment by disclosing that "[a]ntenna feed line 1008 may be coupled to antenna

1012 and chip grounding line 1010 coupling chip 1006 to ground plane 1004." *Id.*, ¶ [0128].

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



King, Fig. 28 (annotated); Ex. F, ¶ 77.

Further, the claims in King repeatedly recite attachment of an electronic to the second surface. For example, claim 18 states that "the chip is grounded by the chip grounding line and *coupled to said antenna by said feed line*." *Id.*, cl. 18 (emphasis added). To further demonstrate attachment to the second surface, King explains that the "Feed line 1008 may be a conductive strip with a non-conductive adhesive or material *securing it to substrate 1002 and antenna 1012*." *Id.*, ¶ [0108] (emphasis added). As shown above, the antenna 1012 element is located on the second surface, opposite the first surface and ground plane. Accordingly, King provides an express disclosure of an electronic component attached to the second surface of an antenna construction. Ex. F, ¶ 78.

### i)    [1h]: "[the electronic component is] connected from the first antenna terminal to the transmission line and from the second terminal to either a second transmission line or the fold"

King discloses element [1h]. As shown in Figure 18 reproduced and annotated below, King discloses a wireless communication chip 1006 (i.e., an electronic component) which may comprise

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

a control system, memory, battery, sensor, and other conventional components. *Id.*, ¶¶ [0104], [0107], [0125]; Figs. 18, 27, 28. The chip is positioned on the second surface of substrate 1002 and connected to the antenna 1012 (i.e., transmission line) from a terminal on the left side of the chip via a feed line 1008. *Id.* ¶ [0108]; Fig. 18. The chip is also connected to a second transmission line (i.e., grounding line 1010) from a second terminal on the right side of the chip. Grounding line 1010 "electrically connects wireless communication chip 1006 to ground plane 1004" and is therefore functionally the same as a "transmission line." *Id.* ¶¶ [0109]; Fig. 18; Ex. F, ¶ 79.



King, Fig. 18 (annotated); Ex. F, ¶ 79.

Fig. 28 as reproduced and annotated below also discloses a similar structure. For example:

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



*Id.*, Fig. 28 (annotated); Ex. F, ¶ 80.

Further, the claims in King repeatedly recite attachment of an electronic to the second surface. For example, claim 18 states, "[W]rapping said chip component around a side of said substrate such that *the chip is grounded by the chip grounding line and coupled to said antenna by said feed line*." *Id.*, cl. 18. Accordingly, King provides an express disclosure of an electronic component connected from the first antenna terminal to the transmission line and from the second terminal to either a second transmission line or the fold. Ex. F, ¶ 81.

### 2.    Claim 2

#### a)  [2pre] "Antenna construction according to claim 1"

To the extent the preamble is limiting, King discloses an antenna construction, as discussed in Section VIII.A.1.

42

      **b) [2a] "wherein the length of the transmission line connected to the first antenna terminal of the component is λ\*(2n-1)¼, where n=1,2,3"**

King discloses element [2a]. King discloses that "[a]ntenna 1012 may be a quarter wavelength long for the desired operating frequency." King, ¶ [0111]. Note that element [2a] uses a formula "λ\*(2n-1)¼" for the length of the transmission line. When n=1, λ\*(2n-1)¼= ¼ λ, or a quarter wavelength. Ex. F, ¶ 82.

Indeed, King discloses multiple embodiments where it is explicit about the antenna being "quarter wavelength antenna." King, ¶¶ [0047]-[0057], [0111], [0115], [0125]; cl. 26, Figs 17-28. For example, King explicitly discloses that "This distance is measured from first end 1016 to second end 1018," which is illustrated in Fig. 18 reproduced below. Ex. F, ¶ 83.



King, Fig. 18 (annotated); Ex. F, ¶ 83.

    **3. Claim 3**

      **a) [3pre] "Antenna construction according to claim 1 or 2"**

To the extent the preamble is limiting, King discloses an antenna construction, as discussed in Sections VIII.A.1 and VIII.A.2.

    **b)  [3a] "wherein the length of the transmission line connected to the second antenna terminal of the component is λ\*n½, where n=0,1,2,3"**

Requester notes that this element is indefinite as it is unclear whether the recited "n" is the same "n" recited in claim 2. To the extent that the "n" recited in claim 3 is different from the "n" recited in claim 2, King discloses element [3a]. As shown below, King discloses a wireless communication chip 1006 (i.e., an electronic component). *Id.*, ¶¶ [0104], [0107], [0125]; Figs. 18, 27, 28. This chip is attached via various transmission lines, such as the antenna feed line 1008 and the chip grounding line 1010. *Id.* ¶¶ [0104], [0107]-[0110], [0125]-[0127]; Figs. 18, 27, 28. King discloses that "chip grounding line 1010 coupl[es] chip 1006 to ground plane 1004." *Id.* ¶ [0128]. As shown in Fig. 18 (reproduced below), the chip 1006 is located at the edge of substrate, so the length of the transmission line is zero, or λ\*n½, where n=0. Notably, Patent Owner characterized King on August 1, 2018, in response to an Examination Report in counterpart European Patent Application EP 1886379, that element [1010] "cited [by the European Examiner] to correspond with the currently claimed second transmission line, is merely a chip grounding element." Ex. D, at 2. Patent Owner, through this statement, took the position that the second transmission line has a zero length, which is acknowledged by the European Office. Ex. E, at 2.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



#### 4.    King, Fig. 18 (annotated); Ex. F, ¶ 85.Claim 5

##### a)  [5pre] "Antenna construction according to claim 3"

To the extent the preamble is limiting, King discloses an antenna construction, as discussed in Sections VIII.A.3.

##### b)  [5a] "wherein the second antenna terminal of the component is connected to the transmission line, the length of which is λ*(2n-1)¼"

Requester notes that this element is indefinite as it is unclear what the recited "n" refers to: whether the "n" recited in claim 3, or the "n" recited in claim 2. To the extent that the "n" recited in claim 5 is the "n" in claim 3 and not claim 2, it is indefinite because when n=0, λ*(2n-1)¼ is negative. Further, it is indefinite because λ*(2n-1)¼ cannot be equal to λ*n½, as recited in claim 3, which claim 5 depends from.

To the extent that the "n" recited in claim 5 is the "n" in claim 2 and not in claim 3, King discloses element [5a]. King discloses that "[a]ntenna 1012 may be a quarter wavelength long for the desired operating frequency." King, ¶ [0111]. Note that element [5a] uses a formula "λ*(2n-

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

1)¼” for the length of the transmission line. When n=1, λ*(2n-1)¼= ¼ λ, or a quarter wavelength.
Ex. F, ¶ 86.

Indeed, King discloses multiple embodiments where it is explicit about the antenna being "quarter wavelength antenna." King, ¶¶ [0047]-[0057], [0111], [0115], [0125]; cl. 26, Figs 17-28. For example, King explicitly discloses that "[t]his distance is measured from first end 1016 to second end 1018," which is illustrated in Fig. 18 reproduced below.



*Id.*, Fig. 18 (annotated); Ex. F, ¶ 83.

### 5.    Claim 6

#### a)    [6pre] "Antenna construction according to claim 1 or 2"

To the extent the preamble is limiting, King discloses an antenna construction, as discussed in Sections VIII.A.1 and VIII.A.2.

#### b)    [6a] "wherein the component is a passive RFID circuit"

King discloses element [6a]. King refers to "wireless communication device," such as "wireless communication device 1000" shown in Fig. 18, as "radio frequency identification

(RFID) transponder or other identification device." King, ¶ [0003]. King specifically discloses that "wireless communication device 1000 may be either active or passive." *Id.* ¶ [0060].

Accordingly, King discloses that an antenna construction that is a passive RFID circuit.

### 6. Claim 7

#### a) [7pre] "The use of the antenna construction according to claim 1 or 2"

Requester notes that claim 7 is a "use" claim that is improper under 35 U.S.C. § 101. To the extent that the preamble is limiting, King discloses the underlying antenna construction, as discussed in Sections VIII.A.1 and VIII.A.2.

#### b) [7a] "as the antenna of an RFID circuit"

King discloses element [7a]. King refers to "wireless communication device," such as "wireless communication device 1000" shown in Fig. 18, as "radio frequency identification (RFID) transponder or other identification device." King, ¶ [0003].

Accordingly, King discloses that an antenna construction that is an RFID circuit.

### 7. Claim 8:

#### a) [8pre] "Antenna construction according to claim 3"

To the extent the preamble is limiting, King discloses an antenna construction, as discussed in Sections VIII.A.3.

#### b) [8a] "wherein the component is a passive RFID circuit"

King discloses element [8a]. King refers to "wireless communication device," such as "wireless communication device 1000" shown in Fig. 18, as "radio frequency identification (RFID) transponder or other identification device." King, ¶ [0003]. King specifically discloses that "wireless communication device 1000 may be either active or passive." *Id.* ¶ [0060].

Accordingly, King discloses that an antenna construction that is a passive RFID circuit.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

8.    **Claim 10:**

c)    **[10pre] "Antenna construction according to claim 5"**

To the extent the preamble is limiting, King discloses an antenna construction, as discussed in Sections VIII.A.4.

d)    **[10a] "wherein the component is a passive RFID circuit"**

King discloses element [10a]. King refers to "wireless communication device," such as "wireless communication device 1000" shown in Fig. 18, as "radio frequency identification (RFID) transponder or other identification device." King, ¶ [0003]. King specifically discloses that "wireless communication device 1000 may be either active or passive." *Id.* ¶ [0060].

Accordingly, King discloses that an antenna construction that is a passive RFID circuit.

9.    **Claim 11**

a)    **[11pre] "The use of the antenna construction according to claim 3"**

Requester notes that claim 11 is a "use" claim that is improper under 35 U.S.C. § 101. To the extent that the preamble is limiting, King discloses the underlying antenna construction, as discussed in Sections VIII.A.3.

b)    **[11a] "as the antenna of an RFID circuit"**

King discloses element [11a]. King refers to "wireless communication device," such as "wireless communication device 1000" shown in Fig. 18, as "radio frequency identification (RFID) transponder or other identification device." King, ¶ [0003].

Accordingly, King discloses that an antenna construction that is an RFID circuit.

### 10.    Claim 13

#### c)  [13pre] "The use of the antenna construction according to claim 5"

Requester notes that claim 13 is a "use" claim that is improper under 35 U.S.C. § 101. To the extent that the preamble is limiting, King discloses the underlying antenna construction, as discussed in Sections VIII.A.4.

#### d)  [13a] "as the antenna of an RFID circuit"

King discloses element [13a]. King refers to "wireless communication device," such as "wireless communication device 1000" shown in Fig. 18, as "radio frequency identification (RFID) transponder or other identification device." King, ¶ [0003].

Accordingly, King discloses that an antenna construction that is an RFID circuit.

### 11.    Claim 14

#### e)  [14pre] "The use of the antenna construction according to claim 6"

Requester notes that claim 14 is a "use" claim that is improper under 35 U.S.C. § 101. To the extent that the preamble is limiting, King discloses the underlying antenna construction, as discussed in Sections VIII.A.5.

#### f)  [14a] "as the antenna of an RFID circuit"

King discloses element [14a]. King refers to "wireless communication device," such as "wireless communication device 1000" shown in Fig. 18, as "radio frequency identification (RFID) transponder or other identification device." King, ¶ [0003].

Accordingly, King discloses that an antenna construction that is an RFID circuit.

### 12.    Claim 15

**g)  [15pre] "The use of the antenna construction according to claim 8"**

Requester notes that claim 15 is a "use" claim that is improper under 35 U.S.C. § 101. To the extent that the preamble is limiting, King discloses the underlying antenna construction, as discussed in Sections VIII.A.7.

**h)  [15a] "as the antenna of an RFID circuit"**

King discloses element [15a]. King refers to "wireless communication device," such as "wireless communication device 1000" shown in Fig. 18, as "radio frequency identification (RFID) transponder or other identification device." King, ¶ [0003].

Accordingly, King discloses that an antenna construction that is an RFID circuit.

### 13.    Claim 17

**i)  [17pre] "The use of the antenna construction according to claim 10"**

Requester notes that claim 17 is a "use" claim that is improper under 35 U.S.C. § 101. To the extent that the preamble is limiting, King discloses the underlying antenna construction, as discussed in Sections VIII.A.8.

**j)  [17a] "as the antenna of an RFID circuit"**

King discloses element [17a]. King refers to "wireless communication device," such as "wireless communication device 1000" shown in Fig. 18, as "radio frequency identification (RFID) transponder or other identification device." King, ¶ [0003].

Accordingly, King discloses that an antenna construction that is an RFID circuit.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

**B.    Ground 2: Claims 1 and 6 Are Unpatentable over Baba Under 35 U.S.C. §§ 102 and 103**

    **1.    Independent Claim 1**

        **a)    [1pre]: "Antenna construction for a double-ended antenna circuit, which comprises . . ."**

To the extent that the preamble is limiting, Baba discloses an antenna construction for a double-ended antenna circuit, for use in an RFID tag or wireless integrated circuit (IC) tag. Baba, Abstract, Figs. 1, 4, 8, 9, 11, and 13. As disclosed in Baba, an antenna pattern 30 formed around a dielectric member, with the antenna pattern configured as either a loop or U-shape with a chip electrically connected to the antenna by two chip pads. *See id*., e.g., Figs. 1, 4, and 9. The figures and description in Baba show the antenna pattern extending along the surface of the dielectric member, with the IC chip bridging two points on the antenna, thereby forming a double-ended configuration. *Id.*; Ex. F, ¶ 90.

For example, as shown in Figure 9 reproduced below, Baba illustrates an antenna construction for a double-ended antenna circuit. The chip 40 is connected to an antenna pattern 30 and a chip pad 32. Baba, ¶ [0070]-[0071]; Fig. 9. The chip pad 32 is provided parallel to the antenna pattern 30. *Id.* ¶ [0071]; Fig. 9. The feeding point of the IC chip 40 is adjustable by sliding the IC chip along the length in the direction of the arrow shown in Fig. 9. *Id.* ¶ [0073]; Fig. 9. As shown in Figure 9 reproduced below, one side of chip is connected to antenna pattern 30, and the other side of chip 40 is connected to chip pad 32, thus forming a double-ended antenna circuit. *Id.*; Ex. F, ¶ 91.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



Baba, Fig. 9; Ex. F, ¶ 91.

### b) [1a]: "a conductive ground pla[n]e on a first surface"[4]

Baba discloses element [1a]. As shown below, the side-by-side figures from the '143 patent and Baba demonstrate that Baba discloses "a conductive ground plane on a first surface." In the '143 patent (left), the ground plane (first surface) 6 is opposite of the second surface which has the chip 4 attached to it, separated by an insulation layer that creates a fold 1. '143 Patent, Fig. 3. In Baba's figure (right), like the '143 patent, the antenna pattern 30 extends over the insulation layer, thereby creating two parallel surfaces. Baba, Fig. 9. The top surface, annotated as the second surface, integrates the chip 40. The bottom surface, annotated as the first surface, is opposite of the second surface, identical to the embodiment in the '143 figure. Ex. F, ¶ 92.

---

[4] Note that it is assumed that the word "place" as it initially appears in claim 1 is a typographical error and is interpreted as "plane", to maintain consistency with its usage throughout the remainder of the claim and the specification.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



'143 Patent, Fig. 3 (annotated); Baba, Fig. 9 (annotated); Ex. F, ¶ 92.

Figure 10 of Baba, as reproduced and annotated below, is a top view of the film substrate before it is wrapped around an insulation layer as pictured in Figure 9 above. Baba, ¶¶ [0070]-[0075]. Baba describes, with reference to Figure 10, that the film substrate 20 is wrapped around and secured to the dielectric member 10 so that the antenna pattern 30 functions as a patch antenna. *Id.*, ¶ [0072]. In this patch antenna configuration, the film substrate forms a continuous conductive layer on the first surface, serving as the ground plane. *See id.* ¶¶ [0070]-[0075]. The antenna pattern is folded over an insulation layer, thereby creating an opposite second surface where a chip may be mounted. *Id.* Fig 9; Ex. F, ¶ 93.



Baba, Fig. 10 (annotated).

Further, the claims in Baba repeatedly recite the structure for a conductive ground plane on a first surface. For example, claim 22 states, laminating *a first surface* of a dielectric member with the first film substrate such that the IC chip mounted on the first film substrate . . . laminating *a second surface* of the dielectric member with a second film substrate having a second transceiving antenna pattern . . . ." This arrangement confirms that the antenna construction has two separate surfaces, and that the electronic component (the IC chip) is present only on one surface, identical to the '143 patent. Ex. F, ¶ 94.

Baba further discloses other embodiments that meet this element, including Figures 1, 4-14, and 16-25, each showing antenna constructions with a conductive ground plane on a first surface, consistent with claim 1.

### c) [1b]: "a transmission line on at least one second surface"

Baba discloses element [1b]. Baba's disclosure, as illustrated in Figure 9 reproduced and annotated below, anticipates the element "a transmission line on at least one second surface." Figure 9 shows the antenna pattern 30 disposed on the second surface of the dielectric member 10 (e.g., insulation layer), connected to the IC chip 40. Baba, ¶¶ [0072]-[0079]; Fig. 9; Ex. F, ¶ 95.



Baba, Fig. 9 (annotated); Ex. F, ¶ 95.

Further, the specification explains that "[t]he chip pad 32 and the connector 32*a* are composed of the same material as the antenna pattern 30 and are simultaneously formed when the antenna pattern 30 is printed on the film substrate 20." *Id.* ¶ [0071]. This further clarifies that the antenna pattern 30 (i.e., transmission line) is on the second surface. Ex. F, ¶ 96.

Just as in the '143 patent, where transmission lines are formed on a second surface to route signals to and from the electronic component, Baba's chip pads 32 and associated conductors serve the same purpose and are physically located on the second surface of the antenna construction. Baba further discloses other embodiments that anticipate this element, including Figures 1, 4-14, and 16-25, each showing antenna constructions with at least one transmission line on a second surface, consistent with claim 1. Accordingly, Baba expressly discloses "a transmission line on at least one second surface." *Id.* Figs. 1, 4-14. Ex. F, ¶ 97.

### d) [1c]: "the transmission line connected to the ground plane through a fold in the edge of the antenna construction,"

Baba discloses element [1c]. Figure 9 reproduced and annotated below discloses "the transmission line connected to the ground plane through a fold in the edge of the antenna construction." As shown below in annotated Fig. 9, the antenna pattern 30 (i.e., transmission line) runs along the second surface of the dielectric member 10 and is connected to the chip 40. Baba ¶ [0072]; Fig. 9. Importantly, the antenna pattern 30 (i.e., transmission line) is routed to the edge of the antenna structure, where it is electrically connected through a fold 22 to the conductive ground plane located on the first surface, enabling current to flow and complete the antenna circuit. *Id.*; Ex. F, ¶ 98.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



Baba, Fig. 9 (annotated); Ex. F, ¶ 98.

Baba further discloses other embodiments that meet this element, including Figures 1, 4, 8-14, 16, 17, and 20-23, each showing antenna constructions with an antenna pattern 30 (i.e., transmission line) connected to the ground plane through a fold 22 on the edge of the antenna construction, consistent with element [1c]. Ex. F, ¶ 99.

### e) [1d]: "so that the fold acts as a primary source of a magnetic field"

Baba inherently discloses element 1[1d]. As discussed in Section VIII.A.1, element [1e], Patent Owner has taken the position in litigation that the fold "acts as a primary source of a magnetic field" by nature of the antenna structure as described in the claim. *See* L-2, at 14-18. As stated by the Patent Owner, "[magnetic] concentration results from the geometry and current path. . . ." *Id.* at 17-18. Further, according to the Patent Owner, "structural features—like the fold—

support circulating currents that generate magnetic field components capable of radiating effectively into space."[5] *Id.* at 16.

During litigation, the Patent Owner stated, "[t]he 'fold' structure concentrates received energy and facilitates the formation of a resonant current distribution that produces the magnetic field component of the emitted radiation." L-2, at 16. Prof. Smith explains that, in the view of a person of ordinary skill in the art ("POSITA"), the Patent Owner's statement is understood to mean that simply including a fold in the antenna structure inherently causes the fold to function as "a primary source of a magnetic field." Ex. F ¶ 53. This technical explanation, provided by the Patent Owner, confirms that the claimed fold structure results in the formation of a magnetic dipole, which is responsible for the antenna's radiative properties. *Id.* ¶ 54.

Taken together, the Patent Owner's own statements establish that, if the fold structure is present as claimed, "the fold acts as a primary source of a magnetic field." Thus, in line with the Patent Owner's own statements, any prior art structure implementing such a fold will necessarily possess these properties. *Id.* ¶ 55. *See Shockwave Medical, Inc. v. Cardiovascular Systems, Inc.*, 1371, 1380 (Fed. Cir. 2025) (held that patent owner statements can be used as evidence of general background knowledge to supply missing claim limitations).

In many of the embodiments disclosed by Baba, the antenna structure is wrapped or folded around a dielectric member. Baba, ¶¶ [0014]-[0016], Figs 1, 4, 6-9, 11, 13-14, 16, 18, 20-23. As seen in the exemplary Figure 9 reproduced and annotated below, this process creates a fold 22 in the antenna structure. *Id.* Fig. 9; Ex. F, ¶ 101.

---

[5] Requester notes that there is no claim construction in the district court yet. Parties in the litigation has not briefed on claim construction, either.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000



Baba, Fig. 9 (annotated); Ex. F, ¶ 101.

Further, claim 1 of the '143 patent is an apparatus claim. In alignment with Patent Owner's statements, this claim element is written in *functional* terms, rather than in structural terms. As stated in the MPEP, "[A]pparatus claims cover what a device *is*, not what a device *does*." *Hewlett-Packard*, 909 F.2d at 1469 (emphasis in original). A claim containing a "recitation with respect to the manner in which a claimed apparatus is intended to be employed does not differentiate the claimed apparatus from a prior art apparatus" if the prior art apparatus teaches all the <u>structural</u> limitations of the claim. *Ex parte Masham,* 2 USPQ2d at 1647. *See* MPEP § 2114(II).

Under the Patent Owner's interpretation, because Baba discloses all the structural limitations of the apparatus of claim 1, it follows that the apparatus disclosed by Baba would perform the same functions, i.e., the fold of Baba's apparatus would also act, or *function*, as a primary source of a magnetic field. Ex. F, ¶ 102.

### f) [1e]: "an insulation layer arranged between the first and the second surfaces"

Baba discloses element [1e]. Baba discloses a dielectric member (10), around which the antenna construction is wrapped or folded, and is thus between the two surfaces. *Id.*, ¶¶ [0049],

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

[0050]; Fig. 1. Within the specification, Baba discloses that the dielectric member is composed of a dielectric material having a certain dielectric constant, may be of any shape (for instance, rectangular cylindrical, triangular prism, spherical, etc.), and may be made from a variety of materials. *Id.*, ¶¶ [0049], [0050], [0058]; Fig. 1. For instance, the dielectric member can be formed with resin such as polytetrafluoroethylene (PTFE), polyphenylether (PPE), and the like, which have excellent processibility and mechanical properties. *Id.*, ¶ [0061]; Ex. F, ¶ 103.

Further, as shown in Figure 9 reproduced and annotated below, the dielectric member 10 serves as the insulation layer, physically separating the first surface, on which there is the conductive ground plane, from the second surface, which carries the chip 40. Baba, ¶¶ [0072]-[0079]; Fig. 9. Figure 9 demonstrates that Baba's antenna construction includes an insulation layer (the dielectric member 10) arranged between the first and second surfaces, anticipating the claim element [1e]. *Id.*; Ex. F, ¶ 104.



Baba, Fig. 9 (annotated); Ex. F, ¶ 104.

Further, the claims in Baba repeatedly recite the structure disclosing an insulation layer arranged between the first and the second surfaces. For example, claim 1 recites, "an antenna pattern formed on and around a surface of the dielectric member." Because the antenna pattern is

formed around the dielectric material, which serves as the insulation layer, the dielectric material is positioned between the first and second surfaces. Ex. F, ¶ 105.

Baba further discloses other embodiments that meet this element, including Figures 1, 4-14, and 16-25, each showing antenna constructions with an insulation layer arranged between the first and the second surfaces, consistent with claim 1. Ex. F, ¶ 106.

### g) [1f]: "an electronic component, in which there is a double-terminal antenna connector, connected to the antenna construction"

Baba discloses element [1f]. Specifically, Baba discloses an integrated circuit chip 40, i.e., an electronic component, with a built-in communication circuit and a built-in memory circuit, which is electrically connected to the antenna structure. Baba, ¶¶ [0014], [0049], [0052]; Fig. 1. Chip 40 includes a communication circuit that records and reads the information contact-free, a memory, and a designated control circuit. *Id*., ¶ [0052]; Fig. 1. The chip also includes chip electrodes that electrically connect the IC chip to the chip pads 32. *Id*. Baba further discloses a *pair* of chip pads 32 that electrically connect the IC chip to the antenna pattern 30, i.e., an antenna connector with two connection points or terminals. *Id*. ¶¶ [0051], [0052]; Fig. 1; Ex. F, ¶ 107.



Baba, Fig. 1 (annotated); Ex. F, ¶ 107.

For example, as reproduced and annotated below, Figure 9 shows that the electronic component (chip) may be directly attached to the antenna without a chip pad. For example, as

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

shown in Figure 9 reproduced and annotated below, "the position of the feeding point is adjusted by electrically connecting the chip electrode of the IC chip 40 to the chip pad 32 and the antenna pattern 30, sliding the IC chip 40 along the length (that is, in the direction of the arrow shown in the drawing) of the chip pad 32, and changing the mounting location of the IC chip 40." Baba, ¶ [0073]. Therefore, the disclosed embodiment also satisfies the claimed requirement of an electronic component with a double-terminal antenna connector connected to the antenna construction, as it provides two distinct connection points regardless of the specific mounting positions chosen. Ex. F, ¶ 108.



Baba, Fig. 9 (annotated); Ex. F, ¶ 108.

Further, the claims in Baba repeatedly recite the structure disclosing an electronic component, in which there is a double-terminal antenna connector, connected to the antenna construction. For example, claim 1 states that "the IC chip [is] electrically connected to the antenna pattern." Baba, cl. 1. Moreover, dependent claim 5 states, "wherein the film substrate include[s] a chip pad for electrically connecting the IC chip to the antenna pattern." *Id.*, cl. 5. Therefore, Baba's claims expressly require that the IC chip is electrically connected to the antenna pattern through connection points, such as chip pads. Ex. F, ¶ 109.

Baba further discloses other embodiments that meet this element, including Figures 1, 4-14, and 16-25, each showing antenna constructions with an electronic component, in which there is a double-terminal antenna connector, connected to the antenna construction, consistent with claim 1. Ex. F, ¶ 110.

### h) [1g]: "wherein the electronic component is attached to the second surface of the antenna construction

Baba discloses element [1g]. The annotated figure above from Baba discloses the element "wherein the electronic component is attached to the second surface of the antenna construction." As shown in Fig. 9 reproduced and annotated below, the electronic component (chip) 40 is physically positioned and secured on the second surface (the side opposite of the ground plane) of the dielectric member 10 by using a combination of chip pads 32 and electrodes (not shown). Baba, ¶¶ [0052], [0076]-[0079]. The figure demonstrates that the electronic component is electrically connected and structurally attached to the second surface of the antenna construction. Ex. F, ¶ 111.



Baba, Fig. 9 (annotated); Ex. F, ¶ 111.

Baba further discloses other embodiments that meet this element, including Figures 1, 4-14, 16-25, each showing antenna constructions wherein the electronic component is attached to the second surface of the antenna construction, consistent with element [1g] of claim 1. Ex. F, ¶ 112.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

i)  **[1h]: [the electronic component] connected from the first antenna terminal to the transmission line and from the second terminal to either a second transmission line or the fold"**

Baba discloses element [1h]. Figure 9 of Baba as reproduced and annotated below demonstrates that the electronic component (chip) 40 is connected from its first antenna terminal (i.e., feeding point) to the antenna 30. As shown, the feeding point serves as the initial electrical connection between the chip 40 and the antenna 30. The antenna structure 30 is routed toward fold 22 at the edge of the antenna construction, where it connects to the ground plane (opposite side of the second surface). The second terminal of the chip 40 is connected via chip pad 32 (i.e., second transmission line) to another fold at the edge of the antenna construction, where it connects to the ground plane (opposite side of the second surface), as indicated in the figure. Accordingly, Baba expressly discloses "[the electronic component] connected from the first antenna terminal to the transmission line and from the second terminal to either a second transmission line or the fold," as required by claim 1[h]. Ex. F, ¶ 113.



Baba, Fig. 9 (annotated); Ex. F, ¶ 113.

Baba further discloses other embodiments that meet this element, including Figures 1, 4-14, and 16-25, each showing antenna constructions with the electronic component connected from

the first antenna terminal to the transmission line and from the second terminal to either a second transmission line or the fold, consistent with claim 1. Ex. F, ¶ 114.

### 2.    Claim 6

#### a)    [6pre] "Antenna construction according to claim 1 or 2"

To the extent the preamble is limiting, Baba discloses an antenna construction, as discussed in Sections VIII.B.1.

#### b)    [6a] "wherein the component is a passive RFID circuit."

Baba discloses element [6a]. Baba discloses that its invention "relates to a radio frequency identification (RFID) tag such as a non-contact integrated circuit (IC) card, which receives power supply and information from, and transmits information to, an external device." Baba, ¶ [0002]. The fact that the tag receives power supply from an external device means that it is by definition a passive RFID circuit. Ex. F, ¶ 38.

## IX.    CONCLUSION

For at least the reasons cited above, the prior art patent documents cited in this Request present substantial new questions of patentability with respect to claims 1-3, 5-8, 10, 11, 13-15, and 17 of the '143 patent. *See generally* Ex. F. Moreover, the proposed grounds of rejection set forth in this Request show that claims 1-3, 5-8, 10, 11, 13-15, and 17 are disclosed and taught by the prior art, and the claims are unpatentable as either anticipated or obvious, for at least the above reasons. Accordingly, the Office should declare reexamination of claims 1-3, 5-8, 10, 11, 13-15, and 17 of the '143 patent and reject these claims based on the grounds detailed in this Request.

Request for *Ex Parte* Reexamination
Customer No. 22,852
Attorney Docket No. 13947.0008-00000

If there are any other fees due in connection with the filing of this paper not already paid,

please charge the fees to our Deposit Account No. 06-0916.

Respectfully submitted,
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, LLP

Dated: December 8, 2025          By: /Lionel M. Lavenue/
Lionel M. Lavenue, Reg. No. 46,859

**Attachments: (1) Certificate of Service to Patent Owner**
**(2) Information Disclosure Statement and Form PTO/SB/08**

65

Request for *Ex Parte* Reexamination
U.S. Patent No. 7,724,143
Customer No. 22,852

## <u>CERTIFICATE OF SERVICE</u>

Requester certifies that a complete copy of this Request with associated Exhibits has been

served in its entirety, via USPS, on the Patent Owner's counsel of record in the '143 patent, at

the following address:

BIRCH STEWART KOLASCH & BIRCH, LLP
2600 Park Tower Drive, Suite 600
Vienna, VA 22180-7371

*/Lionel M. Lavenue/*
Lionel M. Lavenue, Reg. No. 46,859
lionel.lavenue@finnegan.com
Finnegan, Henderson, Farabow, Garrett
& Dunner, LLP
1875 Explorer Street, Suite 800
Reston, VA 20190-6023
Tel: 571-203-2700
Fax: 202-408-4400
